184

Cheshire
No. 82-064
Merrimack
No. 82-277
Rockingham
No. 82-365
U.S. District Court
No. 82-465

THE STATE OF NEW HAMPSHIRE

v.

DONALD BROSSEAU, ADMINISTRATOR OF THE
ESTATE OF ADRIAN BROSSEAU

THE STATE OF NEW HAMPSHIRE

v.

ADRIENNE M. ZAPPIA, ADMINISTRATRIX OF THE
ESTATE OF JOHN M. ZAPPIA

ROBERT GORMAN & a.

v.

MANCHESTER MENTAL HEALTH CENTER & a.

GLORIA WETHERBEE, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE
ESTATE OF CARLA ROSE EDWARDS

v.

JACK E. MELTON, SUPERINTENDENT AND CHIEF ADMINISTRATOR,
LACONIA STATE SCHOOL AND TRAINING CENTER, & a.

December 1, 1983

185

*Gregory H. Smith*, attorney general (*Peter T. Foley*, attorney, on the brief and orally in Nos. 82-064, 82-277, and 82-365, and *Loretta*

S. *Platt*, assistant attorney general, on the brief in No. 82-465), for the State.

*Bossie, Kelly & Hodes P.A.*, of Manchester (*Laurence E. Kelly* on the brief, and *Donald L. Wyatt, Jr.*, orally), for the defendant Donald Brosseau.

*Ronald K. Lospennato* and *M. Elaine Beauchesne*, of Concord, by brief in No. 82-064 for the Developmental Disabilities Advocacy Center, Inc., as amicus curiae.

*Brown & Nixon P.A.*, of Manchester (*Edward W. Stewart, Jr.*, on the brief and orally), for the defendant Adrienne M. Zappia.

*Dorner & Parnell*, of Londonderry, and *Marien E. Evans*, of Boston, Massachusetts (*William B. Parnell* and *Ms. Evans* on the brief, and *Mr. Parnell* orally), for the plaintiffs Robert Gorman *& a.*

*Boyer & Kinghorn*, of Nashua (*Clifford R. Kinghorn, Jr.*, on the brief), by brief for the plaintiff Gloria Wetherbee.

KING, C.J. (with whom BROCK, J., concurs). Chapter 556 of the New Hampshire Laws of 1973 (codified at RSA chapter 135-B) was enacted, in part, to guarantee every civilly committed mentally ill patient "a right to adequate and humane treatment." RSA 135-B:43. In 1975, the New Hampshire Legislature extended this right to "[e]very developmentally impaired client" treated by the New Hampshire Division of Mental Health. RSA 171-A:13 (Supp. 1981). Our inquiry in the present appeals is limited to two questions: (1) Did the legislature in enacting RSA 135-B:43 and RSA 171-A:13 (Supp. 1981) impliedly waive sovereign immunity as to statutory and tort claims brought by institutionalized patients against the State or State agents for money damages? (2) If so, is RSA 171-A:13 (Supp. 1981) intended to waive the State's eleventh amendment immunity from suit by its citizens in federal court? For the reasons that follow, we answer question one "yes" and question two "no."

We have consolidated four cases involving mentally ill, mentally retarded and physically disabled patients who allegedly were injured while institutionalized at civil mental health facilities operated by the State. Claims for compensatory damages were brought by or on behalf of these patients against the State and State agents, alleging that the negligent psychiatric and medical treatment provided the patients in State facilities was the proximate cause of irreparable injury.

In two of the consolidated suits, the defendants brought counterclaims for the wrongful death of their decedents in response to the actions filed by the State, pursuant to RSA 126-A:47 (Supp. 1981), to

recover expenses for the board and treatment provided these two decedents while patients at the New Hampshire Hospital. In the first case, No. 82-064, the deceased, Adrian Brosseau, is alleged to have been suicidal during the period he was involuntarily committed to the State hospital. Brosseau's estate argues that employees of the State hospital were negligent in discharging Brosseau and that their negligence was the proximate cause of his subsequent suicide. In response to the State suit to recover the cost of treating the deceased, Brosseau's estate filed a counterclaim for wrongful death, seeking damages.

The Superior Court (*Pappagianis*, J.) granted the State's motion to dismiss the counterclaim, ruling that the doctrine of sovereign immunity barred an affirmative recovery. But the court also held that the estate's claim could be asserted as a defense in a plea of recoupment to defeat or diminish the State's reimbursement claim. The trial resulted in a verdict for the State, which was offset by the estate's recoupment claim. This is an appeal from the decision of the trial judge denying the estate's motion to set aside the verdict.

The second case, No. 82-277, grew out of the involuntary civil commitment of John M. Zappia to the New Hampshire Hospital. It is alleged that State hospital employees physically abused Zappia while he was strapped to a bed and then injected him with an improvident dosage of a tranquilizer, which ultimately led to his heart attack and subsequent death. In response to the State's action to recover hospital expenses, Zappia's estate counterclaimed seeking money damages, alleging that the negligent care and treatment of the deceased proximately caused the death. The estate also sought recovery for violation of the decedent's federal constitutional rights pursuant to 42 U.S.C. § 1983 (1979) and for breach of an implied contract of care, treatment and maintenance. The Superior Court (*Souter*, J.) approved the recommendation of the Master (*Frank B. Clancy*, Esq.) that all three counts of the counterclaim be dismissed on the ground of sovereign immunity. The decedent's estate then filed an interlocutory appeal to this court. *See* Sup. Ct. R. 8.

In case No. 82-365, the plaintiff alleged that the negligent failure of State employees to timely diagnose a brain tumor in an eleven-year-old patient of the New Hampshire Hospital proximately caused her permanent blindness. The plaintiff filed suit seeking damages against the Manchester Mental Health Center, two psychologists employed by the center, the State, and three State hospital employees, including a physician. The State and State employees named as defendants moved to dismiss the negligence claims on the basis of sovereign immunity. On the recommendation of the Master (*Mayland H. Morse, Jr.*, Esq.), the Superior Court (*Contas*, J.) trans-

ferred to this court without ruling, pursuant to Supreme Court Rule 9, the question whether the State and its employees are insulated from suit by the doctrine of sovereign immunity.

In case No. 82-465, the final case consolidated for our review, the United States District Court for the District of New Hampshire (*Devine*, C.J.) certified the following questions to this court:

(1) "[Does] RSA 171-A:13 (Supp. 1981) constitute a waiver of sovereign immunity as to state statutory and common law claims in an action for damages brought by the administratrix of the estate of a resident of Laconia State School;"

(2) "[If so,] is the statute intended to constitute a waiver of the state's immunity from suit in Federal Court on the state law claims and on the related federal civil rights actions?"

This case arose from the alleged negligent treatment and subsequent death of Carla Rose Edwards, a seventeen-year-old girl, at the Laconia State School and Training Center (Laconia School). Edwards was a developmentally-impaired person, as defined by RSA 171-A:2, V (Supp. 1981), who was institutionalized at the Laconia School. The complaint filed in federal district court by Edwards' mother, individually and as administratrix of Edwards' estate, alleged that Edwards' death was caused by her choking on vomit that she inhaled due to her physical disability. It alleged that the proximate cause of Edwards' death was the negligent failure of the employees of the Laconia School to adequately treat her, and the administratrix sought compensatory damages.

The plaintiff brought section 1983 claims against named defendants Jack E. Melton, the Laconia School Superintendent, and Thomas M. Ruffle, M.D., a pediatrician at the Laconia School. In addition, the plaintiff commenced pendent claims based on State law against the defendants for negligence, wrongful death and violations of the statutory right to "adequate and humane habilitation and treatment" of developmentally-impaired persons conferred by RSA 171-A:13 (Supp. 1981). The State, on behalf of the defendant Melton, filed motions to dismiss the claims against Melton in his official capacity based on the eleventh amendment to the United States Constitution. The State also moved to dismiss the State claims on the ground of sovereign immunity. Consideration of these motions to dismiss was deferred by the United States District Court pending resolution of the above-certified questions.

In our opinion, it is not necessary that we reach the ques-

tion of whether the doctrine of sovereign immunity, as incorporated in RSA 99-D:1 (Supp. 1981), is constitutional in order to resolve the appeals presently before us. We have held that the State may waive its immunity and permit suits to be brought by parties injured by the negligence of State agents. *See Sousa v. State*, 115 N.H. 340, 344, 341 A.2d 282, 285 (1975). A waiver occurs when "the legislature has provided for it by statute either expressly or by reasonable implication." *Chasse v. Banas*, 119 N.H. 93, 96, 399 A.2d 608, 610 (1979) (quoting *Public Service Co. v. State*, 102 N.H. 54, 56, 149 A.2d 874, 876 (1959)). In RSA 99-D:1 (Supp. 1981), the New Hampshire Legislature itself recognized that it could waive sovereign immunity. RSA 99-D:1 (Supp. 1981) provides, in pertinent part, that sovereign immunity is the law of the State "except as otherwise provided by statute."

■ This court has strictly construed statutory waivers of sovereign immunity. *Chasse v. Banas supra*. However, where the clear intent of a statute is to confer a right to redress injuries proximately caused by the negligent actions of certain State agents, we have not hesitated to construe that statute to allow recovery of damages. *Id.*

■■ We have also recognized that "[t]he existence of a statutory right implies the existence of all necessary and appropriate remedies." *Chasse v. Banas supra* (quoting *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 239 (1969)). Where a statutory right is violated, resulting in injury to a party within the class protected by the statute, the most appropriate remedy is money damages. *Chasse v. Banas supra; see also Texas & Pac. Ry. Co. v. Rigsby*, 241 U.S. 33, 39 (1916).

■■ The statutes at issue in this case, RSA 135-B:43 and RSA 171-A:13 (Supp. 1981), in almost identical language, grant to civilly committed mentally ill patients and "developmentally impaired clients" of State mental health facilities "a right to adequate and humane treatment." In *Chasse v. Banas*, 119 N.H. at 96, 399 A.2d at 610, this court found that the New Hampshire Legislature, in enacting RSA 135-B:43, "recognized" the civil rights of mentally disabled patients committed to State institutions. We also ruled in *Chasse* that the language of RSA 135-B:43 not only "creates a right" to adequate and humane treatment in State institutions, but "imposes a duty" upon State agents to provide that quality of care. *Id.* Further, we ruled that a breach of this statutory duty by the State or its agents will create a cause of action for damages in tort. We, therefore, held that the legislature in enacting RSA 135-B:43 "waived any claim of sovereign immunity in an action for damages where a

patient . . . seeks to vindicate the denial of this [statutory] right." *Id.* at 97, 399 A.2d at 611.

■■ Because we remain convinced that the conferral of a right implies the existence of a remedy, we reaffirm our holding in *Chasse* that the legislature by enacting RSA 135-B:43 waived any claim of sovereign immunity of the State and State agents in a court action for damages under the statute. The virtually identical language of RSA 171-A:13 (Supp. 1981) compels us to conclude that the legislature similarly intended to waive sovereign immunity to permit individuals to sue the State and State agents for violations of the rights granted by that statute as well.

■ The fact that some language in *Chasse* referred to RSA 135-B:49, and the fact that section 49 was later repealed by the enactment of RSA chapter 99-D (Supp. 1981), does not weaken the analysis we employed in our opinion in *Chasse*. This court's reliance on *Chasse* in *State Employees' Ass'n of N.H. v. Belknap County*, 122 N.H. 614, 621, 448 A.2d 969, 972 (1982) and *Dunaisky v. State*, 122 N.H. 280, 282, 444 A.2d 532, 534 (1982), indicates that we did not consider RSA 135-B:49 necessary to construe a waiver of sovereign immunity.

■ We now consider the second question certified by the United States District Court: Does RSA 171-A:13 (Supp. 1981) constitute a waiver of the State's eleventh amendment immunity from suit in federal court? We hold that the legislature by enacting RSA 171-A:13 (Supp. 1981) did not intend to waive its eleventh amendment immunity from suit in federal court.

■ The eleventh amendment bars retrospective actions for damages against an unconsenting state—or against a state agent in his official capacity—in federal court by its own citizens. *See Quern v. Jordan*, 440 U.S. 332 (1979); *cf. Maine v. Thiboutot*, 448 U.S. 1, 9 n.7 (1980) (eleventh amendment is not a bar to actions brought in *state* court). A state may waive its eleventh amendment immunity from suit in federal court. *Edelman v. Jordan*, 415 U.S. 651, *reh'g denied*, 416 U.S. 1000 (1974). The fact that a state may have relinquished its sovereign immunity from suit in its own courts "is not determinative of whether it has waived its eleventh amendment immunity from suit in federal courts." *Id.* at 677 n.19. The waiver must be stated by "express language" or by "overwhelming implications." *Id.* at 673 (quoting *Murray v. Wilson Distilling Company*, 213 U.S. 151, 171 (1909)).

■ In light of this strict standard for construing an implied

statutory waiver of eleventh amendment immunity, we conclude that there is no language in RSA 171-A:13 (Supp. 1981), taken as a whole, which indicates that the legislature intended to waive the eleventh amendment bar.

■ If and when we do reach the constitutionality of sovereign immunity, we would be disposed to reconsider the validity of the doctrine as it exists today. However, we should be reluctant to do so until the legislature has been given an opportunity to correct the present procedural and financial inadequacies of statutes relating to sovereign immunity. *See Whitney v. Worcester*, 373 Mass. 208, 212, 366 N.E.2d 1210, 1213 (1977) (where the Massachusetts Supreme Judicial Court gave the State legislature until the conclusion of its next session to act to define the limits of governmental immunity, or it would assume the task itself).

The cause of action against the State and its employees created by RSA 135-B:43 and RSA 171-A:13 (Supp. 1981) could also have been litigated before the State Board of Claims (board) under RSA 541-B:12 (Supp. 1981), if the plaintiffs had chosen that remedy. The legislature has limited the maximum amount of tort recovery in each case adjudicated by the board to $50,000. RSA 541-B:14 (Supp. 1981). Further, it has limited the award the board can make without legislative approval to $10,000. RSA 541-B:12 (Supp. 1981). In view of the soaring ·costs of medical care and other expenses frequently incurred by injured parties, these statutory limitations on tort recovery may often preclude the award of adequate compensation to parties who suffer irreparable injury.

■ Although these two ceilings imposed by the legislature are unreasonable, the legislature should be given a further opportunity to take corrective action, increasing the limits on recovery to a level which can satisfy, to a reasonable degree, the valid claims of injured parties, before the judiciary acts. *See Park v. Rockwell Int'l Corp.*, 121 N.H. 894, 900, 436 A.2d 1136, 1140 (1981) (King, C.J., dissenting); *see also Estate of Cargill v. City of Rochester*, 119 N.H. 661, 669, 406 A.2d 704, 708 (1979).

Cases No. 82-064 and 82-277 are reversed and remanded. Case No. 82-365 is remanded. With respect to the questions certified by the United States District Court, the answer to question number one is "yes" and the answer to question number two is "no."

*Nos. 82-064 and 82-277 reversed and remanded; Nos. 82-365 and 82-465 remanded.*

DOUGLAS and BATCHELDER, JJ., concurred specially; SOUTER, J., did not sit.

DOUGLAS and BATCHELDER, JJ., concurring specially: While we agree with the result and reasoning of the opinion by our brothers King and Brock, we wish to give fair notice to our coordinate branches of government that the doctrine of sovereign immunity is unconstitutionally broad in its present statutory form.

In *Sousa v. State,* 115 N.H. 340, 341 A.2d 282 (1975), we addressed a challenge to the doctrine of sovereign immunity. In that case, we deferred to the legislature, stating: "We are of the opinion that *at this time,* it would be inappropriate for the court to abrogate by judicial action the existing rules of state immunity." *Id.* at 345, 341 A.2d at 286 (emphasis added). Our reason for this exercise of judicial restraint was that "[e]xtremely broad considerations of public policy and government administration are involved," *id.,* in the decision to expose the State to liability, and the legislature is thus the better forum for such a decision. In our opinion, the legislature has not responded satisfactorily to the problems that cases such as the ones before us represent. Consequently, we believe the time for judicial deference has passed.

I. *Historical Perspective.*

The doctrine of sovereign immunity has its roots in the English common law. Although it can be traced back to Roman law,

> "the origin of the idea underlying . . . [the doctrine] in the common law seems to have been the theory, allied with the divine right of Kings, that 'the King can do no wrong,' together with the feeling that it was necessarily a contradiction of his sovereignty to allow him to be sued as of right in his own courts."

W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 131, at 970 (4th ed. 1971) (footnotes omitted).

The United States Supreme Court observed that:

> "The doctrine, as it developed at common law, had its origins in the feudal system. Describing those origins, Pollock and Maitland noted that no lord could be sued by a vassal in his own court, but each petty lord was subject to suit in the courts of a higher lord. Since the King was at the apex of the feudal pyramid, there was no higher court in which he could be sued. The King's immunity rested primarily on the structure of the feudal system and secondarily on a fiction that the King could do no wrong."

*Nevada v. Hall*, 440 U.S. 410, 414–15 (1979) (footnotes omitted). Blackstone pointed out that "[t]he king, moreover, is not only incapable of doing wrong, but of thinking wrong: he can never mean to do an improper thing." 1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 246 (1765).

The doctrine of immunity for governmental entities, including the State, is derived from its common-law inception in the case of *Russell v. Men of Devon*, 2 T.R. 667, 100 Eng. Rep. 359 (K.B. 1788), in which it was stated that "it is better that an individual should sustain an injury than that the public should suffer an inconvenience...." *Id.* at 673, 100 Eng. Rep. at 362 (opinion of Ashhurst, J.). This conclusion by the British court was grounded, in part, on the expedient consideration that it would be impractical to assess damages against the individual citizens of an unincorporated county. *Muskopf v. Corning Hospital Dist.*, 55 Cal. 2d 211, 215–16, 359 P.2d 457, 459, 11 Cal. Rptr. 89, 91 (1961); *Ayala v. Phila. Bd. of Pub. Educ.*, 305 A.2d 877, 879 (Pa. 1973). Ironically, the holding in *Russell* was later overruled by the courts of England. *Crisp v. Thomas*, 63 L.T.N.S. 756 (1890); *see generally* Annot., 160 A.L.R. 7, 84 (1946); *Molitor v. Kaneland Com. Unit Dist.*, 18 Ill. 2d 11, 15, 163 N.E.2d 89, 91 (1959), *cert. denied*, 362 U.S. 968 (1960).

The rule of governmental immunity set forth in *Men of Devon* was first applied in this country by Massachusetts in the early nineteenth century. *Mower v. Leicester*, 9 Mass. 247, 249 (1812). Early in our State history, this court embraced the concept of governmental immunity for claims against the State and local governments. *See Farnum v. Town of Concord*, 2 N.H. 392, 393 (1821); *see also State v. Kinne*, 41 N.H. 238, 239 (1860). More recently, we have cut back on governmental immunity, by removing the bar to suit against local governmental agencies. *Merrill v. Manchester*, 114 N.H. 722, 729, 332 A.2d 378, 383 (1974). In *Merrill*, we stated:

> "That an individual injured by the negligence of the employees of a municipal corporation should bear his loss himself as advocated in [*Russell v. Men of Devon*] instead of having it borne by the public treasury to which he and all other citizens contribute, offends the basic principles of equality of burdens and of elementary justice."

*Id.* at 724, 332 A.2d at 380.

This sense of injustice over the application of the doctrine of sovereign immunity has caused our sister States to abrogate the doctrine in whole or in part. *See generally*, K. DAVIS, ADMINISTRATIVE LAW TREATISE § 25.00 (Supp. 1980). As of August 1977, all but thirteen States had by judicial or legislative action "abolished or

limited the defense in suits against the State." *Whitney v. Worcester*, 373 Mass. 208, 212, 366 N.E.2d 1210, 1213 (1977). Since then, three other States have acted as well. *See Jones v. State Highway Commission*, 557 S.W.2d 225, 270 (Mo. 1977); *James v. Jane*, 221 Va. 43, 51, 267 SE.2d 108 (1980); *Hershel v. University Hospital Foundation*, 610 P.2d 237, 242 (Okla. 1980).

Unlike the legislatures in most other States, our legislature has codified the sovereign immunity doctrine by statute, RSA chapter 99-D (Supp. 1981), and has thus preempted our ability to abrogate sovereign immunity judicially in accordance with modern common law, *unless* the statute is unconstitutional. In response to our suggestions, however, *see Sousa v. State*, 115 N.H. at 344–45, 341 A.2d at 285, the legislature partially mitigated the harshness of the sovereign immunity rule by establishing a board of claims to consider monetary awards to relieve innocent victims of the effects of the tortious acts of the State's agents. *See* RSA ch. 541-B (Supp. 1981). In addition, the legislature had expressly waived the State's immunity from tort liability to the extent it has obtained insurance coverage. RSA 412:3; *see Continental Ins. Co. v. N.H. Ins. Co.*, 120 N.H. 713, 714, 422 A.2d 1309, 1310 (1980).

II. *Sovereign Immunity Under the New Hampshire Constitution.*

We note at the outset that the plaintiffs or counterclaimants in these cases have presented claims based upon implied statutory waivers of sovereign immunity, as well as upon the alleged constitutional invalidity of the doctrine. In light of the fact that constitutional claims have been presented in these cases, and because the New Hampshire Legislature is currently studying proposed legislation which would overrule the implied waiver doctrine as a basis for resolving cases like these on statutory grounds, *see* House Bill 676-FN (1983) (sent to interim study, N.H.H.R. JOUR. 724 (1983)), in the interest of judicial economy, these cases should have been decided on a constitutional basis so that we will not be required to adjudicate these issues again in the near future, and to be of assistance to the legislative study.

The adoption and perpetuation of the sovereign immunity doctrine in the United States is especially curious in light of the fact that this country fought the Revolutionary War to free itself from the tyranny of the British Crown. In this State, it is the people who are sovereign, not their government. *See* N.H. CONST. pt. I, arts. 1 and 8. In abrogating that State's sovereign immunity doctrine, the Arizona Supreme Court noted that the adherence to the doctrine by American courts has been

"'one of the mysteries of legal evolution.' . . . Its survival

> for such a great period of time in this country, where the royal prerogative is unknown, has perhaps been even more remarkable, considering it has been universally criticized as an anachronism with out [sic] rational basis. Most writers and cases considering this fact have claimed that its only basis of survival has been on grounds of antiquity and inertia."

*Stone v. Arizona Highway Commission*, 93 Ariz. 384, 388, 381 P.2d 107, 109 (1963) (citations omitted) (quoting Borchard, *Government Liability in Tort*, 34 YALE L.J. 1, 4 (1924)).

Part I, article 14 of the State Constitution provides that all injured parties are entitled to a certain, just, and prompt remedy. N.H. CONST. pt. I, art. 14. It is no longer tenable for us to read into this constitutional provision a proviso: all injured parties *except* those injured by the State. Article 14 has its immediate origins in John Adams' Massachusetts Constitution of 1780. *See* E. STACKPOLE, A HISTORY OF NEW HAMPSHIRE 237. Ultimately, however, it derives from an august fountainhead, The Magna Carta. *See* Washburn, *Origin and Sources of the Bill of Rights Declared in the Constitution of Massachusetts*, VIII PROCEEDINGS OF THE MASS. HIST. SOC. 294, 303 (1866); *see also* MAGNA CARTA c. 40: "Nulli vendemus, nulli negabimus aut differimus rectum vel justitiam." (To no one shall we sell, to no one shall we deny or delay right or justice.) Our concern today is no less important than that of our thirteenth- or eighteenth-century ancestors: to insist that justice be provided fairly to all.

Part I, article 1 provides that our government is derived from the people and is founded on their consent. N.H. CONST. pt. I, art. 1. Article 3 makes it clear that the government originates in a social compact running between the State and the people, whose end is the protection of man's natural rights. *Id.* at art. 3. According to eighteenth-century thought, such a social compact is a necessity because our natural rights are insecure while we exist outside of a justly organized society or inside the "state of nature." *See generally*, R. M. PETERS, THE MASSACHUSETTS CONSTITUTION OF 1780, A SOCIAL COMPACT (1978).

In joining a just society, we surrender the control over certain of our rights to its government for the greater good of the whole. That surrender is valid only so long as there is a *quid pro quo*, with the society providing an equivalent larger good for its exaction from the people. *See* Theophilus Parsons, *The Essex Result, quoted in* R. M. PETERS, *supra* at 88. ("If the individual receives an equivalent for the right of control he has parted with, the surrender of that right is valid; if he receives no equivalent, the surrender is void, and the supreme power [of the State] as it respects him is an usurper.")

Whatever theoretical basis may have existed in the past for the people's surrender of their right to redress from the State no longer can justify the unequal tradeoff that favors the State's coffers. In other words, the bargain is out of balance.

The right to recover for one's injuries is an "important substantive right" under our constitution. *Carson v. Maurer*, 120 N.H. 925, 931–32, 424 A.2d 825, 830 (1980); *see Heath v. Sears, Roebuck & Co.*, 123 N.H. 512, 524, 464 A.2d 288, 295 (1983). We would hold that to the extent that the doctrine of sovereign immunity denies an injured party a "just" remedy, it is unconstitutional. N.H. CONST. pt. I, art. 14.

The injured parties in these cases have also claimed that the doctrine of sovereign immunity violates the constitutional principle of equal protection. *See* N.H. CONST. pt. I, arts. 2 and 12. Their argument is based on the fact that by its adherence to the doctrine of sovereign immunity, the State has established classifications that distinguish persons injured by State employees from persons injured by private citizens. In *Carson*, we held that State-created classifications implicating the right to be indemnified for personal injuries "'must be reasonable, not arbitrary, *and* must rest upon some ground of difference having a fair and substantial relation to the object of the litigation' in order to satisfy State equal protection guarantees." *Carson v. Maurer*, 120 N.H. at 932, 424 A.2d at 831 (quoting *State v. Scoville*, 113 N.H. 161, 163, 304 A.2d 366, 369 (1973)); *see Heath v. Sears, Roebuck & Co.*, 123 N.H. at 524, 464 A.2d at 295.

The continued existence of any application of the doctrine of sovereign immunity depends upon whether the restrictions it places on an injured person's right to recovery be not so serious that it outweighs the benefits sought to be conferred upon the general public. *Cf. Carson v. Maurer*, 120 N.H. at 933, 424 A.2d at 831. In its briefs and oral arguments in these cases, the State has cited two policies justifying the existence of sovereign immunity: the potential financial drain that its elimination would cause on the public treasury, and the inherent distinction between a private and a governmental tortfeasor.

Regarding the first policy asserted by the State to underlie sovereign immunity, we are not persuaded that the blanket protection of the State's coffers afforded by that doctrine is a legitimate legislative objective substantial enough in its relationship to the denial of the right to sue to withstand our heightened standard of review. The dire forecasts of financial doom if the doctrine is abolished are only speculative at best. Furthermore, it is illogical to maintain that the State should be immune from financial responsibility for all the tor-

tious conduct of its agents when the State is in a much better position to accept such responsibility than are over 200 municipalities—which already may be held liable in damages in many instances and are obligated to satisfy any judgment up to $100,000. RSA 507-B:2, :4, I.

We agree with the Pennsylvania Supreme Court that the financial burden rationale is unconvincing, and also that predictions of increased litigation are insufficient grounds to justify the doctrine:

> "Empirically, there is little support for the concern that the courts will be flooded with litigation if the doctrine is abandoned . . . . '[M]ore compelling than an academic debate over the apparent or real increases in the amount of litigation, is the fundamental concept of our judicial system . . . [that] "[i]t is the business of the law to remedy wrongs that deserve it, even at the expense of a 'flood of litigation'; and it is a pitiful confession of incompetence on the part of any court of justice to deny relief upon the ground that it will give the courts too much work to do."'"

*Ayala v. Phila. Bd. of Pub. Ed.*, 305 A.2d at 882 (citations omitted); *see Mayle v. Pennsylvania Dept. of Highways*, 388 A.2d 709, 714 (Pa. 1978); *see also Merrill v. Manchester*, 114 N.H. 722, 733, 332 A.2d 378, 385 (1974) (on motion for rehearing).

Nor do we find compelling the State's second rationale to support sovereign immunity; namely, that there is a distinction *per se* between governmental and private tortfeasors. Although in *Carson* we distinguished *Estate of Cargill v. City of Rochester*, 119 N.H. 661, 406 A.2d 704 (1979), in part, on this basis, *Carson v. Maurer*, 120 N.H. at 942, 424 A.2d at 837, we should no longer accept such a sweeping generalization.

The State bases its argument that public and private tortfeasors are different on the contention that it is more difficult for government to withdraw from providing certain services to the public than it would be for a private entity if its exposure to liability resulting from such services proved to be too great. While we acknowledge that there is merit to this contention in certain instances (*see infra* section III), there is nothing constitutionally obligating the State *itself* to provide institutional psychiatric care to its citizens, as occurred in these cases.

In fact, we did not even have an asylum for the insane until 1842, some sixty-six years after we became a State. Private hospitals are licensed to provide the same psychiatric services as the State does. Yet, private institutions would be exposed to potential liability for the same negligent acts of their employees committed in the per-

formance of their functions as are alleged in these lawsuits. At least since 1906 the law has held that the non-profit charitable hospitals are as amenable to a suit for damages as any other incorporated entity. *Hewett v. Woman's Hospital Aid Ass'n*, 73 N.H. 556, 564, 64 A. 190, 192 (1906). If the Roman Catholic Bishop can be at risk, we see no rational reason why the State's hospital should not be. *See also Guerin v. N.H. Catholic Charities*, 120 N.H. 501, 418 A.2d 224 (1980).

The upshot is that these tort victims' ability to recover for their losses in the cases at bar depends entirely on the fortuity of the fact that the alleged tortfeasors are employees of the State. The defendants would be amenable to suit if they were associated with a private hospital, *see, e.g., Brown v. Mary Hitchcock Memorial Hosp.*, 117 N.H. 739, 378 A.2d 1138 (1977), a charitable institution, *Wheeler v. Monadnock Community Hospital*, 103 N.H. 306, 171 A.2d 23 (1961), or a municipal corporation, *Merrill v. Manchester*, 114 N.H. at 729, 332 A.2d at 383. We have previously rejected this type of denial of equal protection for the purpose of according special privileges to a class of tortfeasors. *See, e.g., Heath v. Sears, Roebuck & Co.*, 123 N.H. at 527, 464 A.2d at 296 (1983); *Henderson Clay Prod's, Inc. v. Edgar Wood & Assoc's, Inc.*, 122 N.H. 800, 802, 451 A.2d 174, 175 (1982); *see also Flax v. Kansas Turnpike Authority*, 226 Kan. 1, 11, 596 P.2d 446, 453 (1979).

We can see no reason why a plaintiff injured by the negligence of a highway department truck driver, or a plaintiff injured by the negligence of medical personnel in administering and supervising treatment to institutionalized patients, should be precluded entirely from seeking monetary compensation for the sole reason that the defendant is the State or an agent of the State. *As applied* to the acts alleged to have caused the injuries in these cases, we do not believe that the sovereign immunity statute is substantially related to the legislative object of treating governmental tortfeasors differently from private tortfeasors, because of the overbreadth of the means of accomplishing the legislative object.

We also note that, as previously mentioned, the State may obtain insurance to protect itself from exposure to tort liability. For more than three decades, to the extent of insurance, tort actions against the State have been allowed by statute. *See* Laws 1951, 197:1. RSA 412:3 provides that the State cannot raise the defense of sovereign immunity for matters involving risks against which it has insured. For many activities, such as use of motor vehicles, the State has purchased a fleet motor vehicle insurance policy. It is illogical to have the rights of our injured or killed citizens depend upon wheth-

er the harm was caused by an insured State car or by a State employee driving his own uninsured vehicle while on State business.

The summary manner in which the court disposed of the equal protection claim raised in *Sousa v. State*, 115 N.H. at 344, 341 A.2d at 285, should be rejected. Accordingly, *Sousa v. State* and any later cases upholding the sovereign immunity doctrine to the extent that they are inconsistent with our opinion herein should be overruled. We would hold that RSA chapter 99-D (Supp. 1981) may not constitutionally be applied to bar tort actions against State tortfeasors for acts that are not inherently governmental.

III. *Sovereign Immunity Retained for Appropriate Acts.*

Our constitution does not require the State to be amenable to suit for *all* acts of its agents. We believe the rule of *Merrill v. Manchester* provides valuable guidance in determining the outer constitutional limits of the sovereign immunity statute:

> "We hold that the immunity from tort liability heretofore judicially conferred upon cities and towns is hereby abrogated except for the following exception. They are immune from liability for acts and omissions constituting (a) the exercise of a legislative or judicial function, and (b) the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion . . . .
>
> This removal of immunity does not impose absolute or strict liability on cities and towns but merely places them subject to the same rules as private corporations if a duty has been violated and a tort committed. In other words it places responsibility on cities and towns under the doctrine of respondeat superior for injuries negligently caused by their agents, servants and employees in the course of their employment."

*Merrill v. Manchester*, 114 N.H. at 729–30, 332 A.2d at 383–84 (citations omitted); *see Muskopf v. Corning Hospital Dist.*, 55 Cal. 2d 211, 220–21, 359 P.2d 457, 462–63, 11 Cal. Rptr. 89, 94–95 (1961); *Evangelical Etc. Ch. of Adna v. State*, 67 Wash. 2d 246, 254–55, 407 P.2d 440, 444–45 (1965); *see also* RESTATEMENT (SECOND) OF TORTS § 895B (3) (1979). The distinction between *routine* activities that are *not uniquely governmental* in nature and activities that are *discretionary* and *inherently* governmental, preserves the concept that "it is not a tort for government to govern." *Dalehite v. United States*, 346 U.S. 15, 57 (1953) (Jackson, J., dissenting).

This distinction has been accurately characterized as an extension of the separation-of-powers doctrine:

> "[The distinction] . . . seems to us only to articulate a policy of preventing tort actions from becoming a vehicle for judicial interference with decision-making that is properly exercised by other branches of the government and of protecting 'the Government from liability that would seriously handicap efficient government operations.' . . . Statutes, regulations, and discretionary functions . . . are, as a rule, manifestations of policy judgments made by the political branches. In our tripartite governmental structure, the courts generally have no substantive part to play in such decisions. Rather, the judiciary confines itself . . . to adjudication of facts based on discernible objective standards of law. In the context of tort actions, with which we are here concerned, these objective standards are notably lacking when the question is not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency. Tort law simply furnishes an inadequate crucible for testing the merits of social, political, or economic decisions."

*Blessing v. United States*, 447 F. Supp. 1160, 1170 (E.D. Pa. 1978) (citations omitted).

It is clear that the discretion inherent in making the types of policy decisions for which governmental officials are elected and appointees are named in our democratic form of government, supports a limited scope of sovereign immunity. Insulating governmental decision-makers from potential liability for their decisions, by virtue of the sovereign immunity statute, is justified primarily on two bases:

> "(1) the injustice . . . of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good."

*Scheuer v. Rhodes*, 416 U.S. 232, 240 (1974).

Sovereign immunity for State officials who make basic policy decisions "characterized by the exercise of a high degree of official judgment or discretion," *Merrill v. Manchester*, 114 N.H. at 729, 332 A.2d at 383, is a means that is substantially related to a legitimate legislative object, and thus does not violate the equal protection

clause of the New Hampshire Constitution. The remedy in those instances where a State official or his appointee is protected by sovereign immunity lies at the ballot box, not in the courts.

We recognize that certain functions of State government, while not necessarily discretionary, are uniquely its alone to perform. For instance, private individuals can drive a vehicle or shovel snow, but only the government can enforce the laws or operate prisons. While we do not have a fact pattern before us that would permit us to draw precisely the line separating governmental and non-governmental functions, the "governmental function" distinction should not be interpreted to bar suit against the State simply because an injury was caused, for example, by a prison truck rather than one operated by the fish and game department. The federal civil rights action under 42 U.S.C. § 1983 (Supp. III 1979) will generally serve as the basis for redressing tortious conduct falling within the ambit of that provision—notwithstanding anything done by this court or the General Court.

The line we would draw has been recognized as the appropriate one by courts and legislatures who have responsibly faced the problem. As the Supreme Judicial Court of Massachusetts observed:

> "We think that the appropriate dividing line falls between those functions which rest on the exercise of judgment and discretion and represent planning and policymaking and those functions which involve the implementation and execution of such governmental policy or planning. The appropriateness of such a dividing line has been widely recognized. The Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. (1970), contains an express exception to governmental liability for '[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government . . . .' *Id.* § 2680(a)."

*Whitney v. Worcester*, 373 Mass. 208, 217, 366 N.E.2d 1210, 1216 (1977). The recent abrogation of governmental tort immunity in Oklahoma was accompanied by the adoption of the same test. *Vanderpool v. Oklahoma*, 672 P.2d 1153 (Okla. 1983). At least eighteen State legislatures have adopted a similar discretionary function exception. *See Whitney v. Worcester*, 373 Mass. at 217, 366 N.E.2d at 1216.

IV. *Conclusion.*

We should not hesitate in the future to declare that the State can no longer occupy a privileged position vis-a-vis its citizens. *We,* "the people," are the sovereigns under our State Constitution. A contrary theory may make sense in a monarchy or a dictatorship, but not in a democracy based upon the American theory of a freely formed social compact. *See* N.H. CONST. pt. I, arts. 3 and 8.

In our opinion, there is no question that accountability will beget responsibility, and our citizenry will benefit from the demise of the doctrine of sovereign immunity.