Merrimack
No. 2010-548

CHASE HOME FOR CHILDREN & a.

v.

NEW HAMPSHIRE DIVISION FOR CHILDREN, YOUTH AND FAMILIES

Argued: September 15, 2011
Opinion Issued: November 22, 2011

*Orr & Reno, P.A.*, of Concord (*Lisa Snow Wade* and *Rachel Aslin Goldwasser* on the brief, and *Ms. Wade* orally), for the plaintiffs.

*Michael A. Delaney*, attorney general (*Nancy J. Smith*, senior assistant attorney general, and *Rebecca L. Woodard*, assistant attorney general, on the brief, and *Ms. Smith* orally), for the State.

Duggan, J. The defendant, the New Hampshire Division for Children, Youth and Families (DCYF), appeals the order of the Superior Court (*Sullivan*, J.) to pay $3,553,479.55 to the plaintiffs, Chase Home for Children, Child & Family Services, Hannah House, NFI North, Odyssey House, Orion House and Pine Haven Boys Center. We affirm.

*I. Facts*

This dispute concerns rates that DCYF paid the plaintiffs in fiscal years 2004, 2005 and 2006. It has been ongoing for over five years, and has already been the subject of two administrative appeals and two opinions of this court. *See Petition of Chase Home for Children*, 155 N.H. 528 (2007); *Petition of N.H. Div. for Children, Youth & Families*, 155 N.H. 577 (2007). The facts below are taken from those opinions, as well as the record and the superior court opinions that are the subject of this appeal.

The plaintiffs are residential childcare providers (the providers) who provide residential placements on behalf of the State to children who have been adjudicated as delinquents, see RSA ch. 169-B (2002 & Supp. 2010); children who have been abused, see RSA ch. 169-C (2002 & Supp. 2010); and children found to be in need of services, see RSA ch. 169-D (2002 & Supp. 2010). The defendant, DCYF, is the division of the New Hampshire Department of Health and Human Services (DHHS) responsible for providing residential childcare services.

In 2003, DCYF and the providers entered into Provider Service Agreements (PSAs) that covered the period from July 1, 2003 to June 30, 2004, and contained automatic renewal clauses. Each PSA outlines the services to be provided and requires the payment rate for those services to be set in accordance with New Hampshire Administrative Rule, He-C 6422 (He-C 6422). The rates cover board and care and are computed on a per diem basis for each child. For children who are non-Medicaid beneficiaries, DCYF pays the full board and care rate. For children who are Medicaid beneficiaries, DCYF pays the full board and care rate less the private non-medical institution rate (PNMI), which is billed to Medicaid. The PSAs only cover services provided to Medicaid beneficiaries.

DCYF's budget for residential childcare services is part of DHHS's overall budget. As with all department budgets, DHHS's budget is broken down into program appropriation units (PAUs), which are then broken down into class lines. The Child and Family Services PAU funds the services provided by DCYF. Class lines 90, 92 and 93 of that PAU are specifically dedicated to paying for residential childcare services.

In fiscal year (FY) 2004, DCYF told the providers that "due to our current fiscal situation, [DCYF] will not be able to approve any increase in residential rates." The providers asked DCYF to reconsider, claiming that the FY 2004 rates were inconsistent with He-C 6422. DCYF declined the request. Pursuant to RSA 170-G:4-a, the providers appealed the rates to a three-person administrative hearing panel. The hearing panel ruled that the FY 2004 rates were not consistent with the methodology set forth in He-C 6422.

In FY 2005, DCYF again informed the providers that it would not be increasing the rates, citing fiscal concerns. The providers requested a reconsideration of the rates. DCYF refused. The providers appealed the rates to the hearing panel. The hearing panel ruled that the FY 2005 rates were inconsistent with He-C 6422.

The hearing panel's rulings established that DCYF had underpaid the providers by approximately $1.3 million in FY 2004 and $1.6 million in FY 2005, a fact that is not disputed by the parties. The providers requested the

hearing panel to order DCYF to compensate them for the underpayment, but the panel ruled that it lacked the authority to do so.

The providers then filed two petitions for writ of certiorari in this court seeking review of the FY 2004 and 2005 hearing panel decisions. The cases were consolidated in *Petition of Chase Home for Children*, 155 N.H. 528 (2007). We affirmed the hearing panel determinations that DCYF had underpaid the providers. *Id.* at 534-35. However, we held that even though the "[providers] are entitled to retroactive payments at the [appropriately] calculated rates," the hearing panel does not have the authority to order such payments. *Id.* at 535.

While the above dispute was ongoing, the providers appealed the FY 2006 rates to the hearing panel. This time DCYF took the position that it no longer had a legal obligation to set the rates according to He-C 6422 because of budget restrictions imposed by Laws 2005, chapter 176 (Budget Bill) and Laws 2005, 177:117 (Trailer Bill). DCYF argued that under the Budget Bill and Trailer Bill it had to increase the FY 2006 rate by only five percent. It further argued that the five percent increase should be based on the FY 2005 paid rates, not the FY 2005 rates as calculated under He-C 6422. The hearing panel disagreed and ruled that the FY 2006 rates had to be increased by five percent over what the FY 2005 rates should have been under He-C 6422, not the paid rates. DCYF appealed the panel's ruling to this court. In *Petition of New Hampshire Division for Children, Youth and Families*, 155 N.H. 577 (2007), we affirmed the panel's decision.

As mentioned above, DCYF consistently pointed to fiscal concerns when it failed to pay the appropriate rates. In FY 2004, 2005 and 2006 there were insufficient funds in class lines 90, 92 and 93 to cover the rates as required by He-C 6422. However, the evidence at trial established that in FY 2004 and 2005 DHHS, as a whole, lapsed a significant amount of money to the general fund. An internal DHHS letter showed a total lapse of approximately $61 million, while a document produced for trial by Stephen Mosher, an employee of DHHS, showed a total lapse of approximately $70 million.

To cover fiscal shortfalls, a State agency can transfer money between class lines and PAUs. Such transfers require the permission of the fiscal committee and the Governor and Council. The record shows that DHHS routinely requests and receives permission to transfer funds. The record here also indicates that approximately $39 million of the aforementioned lapse was available for transfer, an amount that could have fully covered the FY 2004 and 2005 rates. In spite of this, DHHS did not request permission to transfer funds into class lines 90, 92 and 93. The record, though, does not indicate whether there was a significant lapse in FY 2006 that could have covered those rates.

In our prior opinions, we declined to address "what further remedies, if any, [were] available to the [providers], such as whether they [can] obtain relief in a civil action in superior court." *Petition of N.H. Div. for Children, Youth & Families,* 155 N.H. at 584; *accord Petition of Chase Home for Children,* 155 N.H. at 535. Eventually, the providers did seek such relief. In 2008, they filed a complaint against DCYF in superior court, seeking damages for the underpayments. Specifically, they alleged breach of contract, breach of the implied covenant of good faith and fair dealing, unconstitutional taking without just compensation, and violations of RSA chapters 169-B, 169-C and 169-D, and associated laws.

Prior to trial, the Superior Court (*Fauver,* J.) denied DCYF's motion for summary judgment. The court first addressed the providers' breach of contract claim. DCYF argued that no contracts existed. The providers responded that the PSAs are express contracts for services for Medicaid children, and that the parties' course of dealing for services for non-Medicaid children created implied-in-fact contracts. The court ruled that the PSAs are express contracts, but that more facts were needed to determine whether implied-in-fact contracts existed. The court also rejected DCYF's argument that the statute of limitations barred some of the providers' contract claims.

DCYF next asserted that the providers failed to allege sufficient facts to support their good faith and fair dealing claim. The providers' claim rested on DCYF's refusal to reimburse the providers after the hearing panel determined that DCYF had underpaid them. The court found that there were genuine issues of material fact on this claim.

Next, DCYF argued that the providers' unconstitutional taking claim must fail on summary judgment because, among other things, the providers voluntarily accepted referrals from DCYF. The court did not agree. It held that there were genuine issues of material fact as to the taking claim.

DCYF also argued that RSA chapters 169-B, 169-C and 169-D do not create a private cause of action for the providers' underpayment claim. The court ruled that a private cause of action does exist because "the right to appeal granted by RSA 170-G:4-a would be rendered meaningless if there was no way to enforce the results of the appeal process, and . . . the legislature could not have intended such a result." DCYF went on to argue that, nevertheless, any private cause of action is barred by sovereign immunity. The court disagreed, ruling that because the "statutes have addressed [DCYF's] liability, . . . the state has waived sovereign immunity." The court also ruled that RSA 491:8 waives the State's sovereign immunity for breach of contract claims.

Finally, relying upon Part I, Article 37 of the New Hampshire Constitution, DCYF argued that any order requiring it to pay the providers

would violate the doctrine of separation of powers because it would interfere with legislative spending power. The court disagreed, ruling that such an order would simply resolve a contract dispute and require DCYF "to adhere to its own statutes and regulations, as well as adhere to the findings of its own administrative hearing[] panel."

After a seven-day trial with seventeen witnesses and approximately 300 exhibits, the court issued a lengthy ruling. The court found that implied-in-fact contracts existed and that the terms of those contracts are identical to the PSAs. The court concluded that DCYF had breached the express and implied-in-fact contracts because it did not comply with the term of the PSAs that requires the rates to be set in accordance with He-C 6422. Additionally, the court found that DCYF breached the covenant of good faith and fair dealing because during the relevant fiscal years DCYF lapsed $790,735 from class lines 90, 92 and 93 without paying the providers, and DHHS lapsed $65 million without attempting to obtain permission from the fiscal committee and Governor and Council to transfer funds into class lines 90, 92 and 93.

As to the final counts — unconstitutional taking and statutory violations — the court declined to reach the merits of the taking claim because its ruling that DCYF had breached the contracts provided sufficient grounds for its decision. The court did, however, address the statutory violations claim. After reiterating that the providers had a private cause of action to bring their statutory claims, the court ruled that DCYF violated RSA chapters 169-B, 169-C, 169-D and 170-G.

DCYF argued that, regardless of its findings and rulings, the superior court could not order it to pay damages to the providers because the relevant class lines had insufficient funds. First, it argued that it cannot be bound to its contracts to the extent that they exceed appropriations because RSA 9:19 prohibits state officials from "expending any money . . . in excess of the amount voted by the legislature." Second, it argued that its ability to set rates is subject to the availability of funds, and, therefore, its rates had to be consistent with its insufficient funds. According to DCYF, the legislature has the power to alter the rate-setting rules by under-funding, and a court does not have the authority to second-guess its decisions on such matters. Third, DCYF argued that it would have been improper for it to seek permission to transfer funds into the relevant class lines because the Governor and legislature explicitly chose not to include sufficient funds in those lines.

The court rejected these arguments. First, it ruled that RSA 9:19 does not bar the providers' contract claim. Second, it ruled that DCYF has an obligation to follow the rate-setting rules because the providers did not agree to have their rates conditioned on appropriations. Third, it noted that

the Joint Legislative Committee on Administrative Rules rejected DCYF's request to modify He-C 6422 to condition the rates on appropriations. The court reasoned that this action indicated that the legislature in fact intended for DCYF to pay the rates in accordance with He-C 6422.

Finally, the court said that regardless of whether funding was available in the relevant class lines, DCYF still had an obligation to compensate the providers for the underpayment because DHHS had sufficient funds to cover the rates. According to the court, DHHS's lapse of funds was improper because RSA 9:18 states that there "shall be no lapse until the satisfaction or fulfillment of . . . contractual obligations." Moreover, the court suggested that even if DHHS had insufficient funds, DCYF would still be liable because RSA 491:8 states that "if there is not sufficient [funding to cover a judgment against the state for breach of contract], the attorney general shall present the claim to the General Court for requisite appropriation." Accordingly, the court ordered DCYF to pay the providers $3,553,479.55, the total amount of the underpayments in FY 2004, 2005 and 2006.

## II. Discussion

On appeal, DCYF argues that the court erred: (1) in finding that express and implied-in-fact contracts exist; (2) in ruling that the statute of limitations does not bar the providers' FY 2004 and 2005 contract claims; (3) in ordering compensation for the providers in violation of the doctrine of separation of powers and RSA 9:19; (4) in finding that the providers have a private cause of action under RSA chapters 169-B, 169-C and 169-D; and (5) in ruling that DCYF violated the covenant of good faith and fair dealing. We address each argument in turn.

### A. Express and Implied-in-Fact Contracts

The trial court found that the parties entered into express and implied-in-fact contracts. DCYF argues that no such contracts exist. We do not agree.

DCYF's first claim is that the PSAs are not valid contracts because there was no meeting of the minds. For a contract to be valid, there must be a meeting of the minds on all essential terms of the contract, meaning that the parties must have assented to the same contract terms. *Behrens v. S.P. Constr. Co.*, 153 N.H. 498, 501 (2006). The question of whether a meeting of the minds has occurred is analyzed under an objective standard and is a question of fact. *See Syncom Indus. v. Wood*, 155 N.H. 73, 82-83 (2007). Therefore, we will sustain the trial court's finding that there was a meeting of the minds unless it is lacking in evidentiary support or tainted by an error of law. *Behrens*, 153 N.H. at 500-01.

DCYF argues that there was no meeting of the minds because the evidence shows that the parties did not agree on the rates, an essential contract term. Specifically, DCYF asserts that it has always understood the rate term as being conditioned on appropriations, while the providers have always understood otherwise. The parties' subjective understanding of the rate term, though, is irrelevant. To reiterate, what matters is whether from an objective viewpoint the parties assented to the same rate term. *See Syncom Indus. v. Wood*, 155 N.H. at 82.

The PSAs were prepared by DCYF and signed by both parties. Exhibit A, paragraph IX of the PSAs expressly states that rates shall be set "[i]n accordance with He-C 6422." There is no express term in the PSAs that conditions rates on appropriations. Indeed, conspicuously absent is a standard state contract term that makes "payments . . . contingent upon the availability and continued appropriation of funds." *See* Form P-37, para. 4, http://sunspot.nh.gov/statecontracting/documents/contractorgeneralprovi sions.pdf. The exclusion of this boilerplate term demonstrates that the parties did not intend to condition the rates on appropriations.

■ We do not agree with DCYF that paragraph XII of the PSAs requires the rates to be conditioned on appropriations. That term reads as follows: "the Provider agrees that, to the extent future legislative action . . . may have an impact on the services described herein, [DCYF] has the right to modify service priorities and expenditure requirements . . . , in which event the rate for such services will be renegotiated." This term is triggered only if the services provided are affected by legislation, and then provides only for renegotiation of the rates. It simply does not condition rates on appropriations. The evidence amply supports the trial court's finding that there was a meeting of the minds — the rate term is objectively unambiguous, the parties assented to it, and it does not condition rates on appropriations. Accordingly, we uphold the trial court's finding that the PSAs are express contracts.

■ DCYF next argues that the trial court erred when it found that the parties formed implied-in-fact contracts for non-Medicaid children. "An implied in fact contract is a true contract that is not expressed in words; the terms of the parties' agreement must be inferred from their conduct." *Morgenroth & Assoc's. Inc. v. Town of Tilton*, 121 N.H. 511, 514 (1981). Like all contracts, implied-in-fact contracts cannot be formed absent an offer, acceptance, consideration and a meeting of the minds. *Durgin v. Pillsbury Lake Water Dist.*, 153 N.H. 818, 821 (2006). Whether such a contract has been formed is a factual question. *Id.* Thus, we will sustain the trial court's

finding on this issue unless it is lacking in evidentiary support or tainted by an error of law. *Behrens*, 153 N.H. at 500-01.

The trial record establishes that children cared for by the providers occasionally fell outside the scope of the PSAs because the children were not Medicaid beneficiaries at the time of their placement, though they were eligible for Medicaid. Nevertheless, DCYF and the providers treated Medicaid and non-Medicaid children identically. DCYF still undertook the responsibility to pay for the services provided to non-Medicaid children. The total rate paid for these services was the same as the rate paid for Medicaid children. The services provided were the same. And, even though the PSAs technically do not apply to the services provided to non-Medicaid children, the providers were required to follow the terms of the PSAs and the regulations referenced therein when providing such services. The only substantial difference between the two groups was that the PNMI portion of the services provided to non-Medicaid children was paid by DCYF, not Medicaid. In short, the evidence of the parties' overall conduct shows that they intended the terms of the PSAs to apply to the services provided to non-Medicaid children.

██ DCYF also argues that there was no meeting of the minds on the rates for the implied-in-fact contracts, the same argument DCYF made for the PSA contracts. Given that the terms of the implied-in-fact contracts are identical to the PSAs, we likewise hold that there was a meeting of the minds for the implied-in-fact contracts. Accordingly, we uphold the trial court's finding that the parties entered into implied-in-fact contracts that covered non-Medicaid children.

*B. Statute of Limitations*

DCYF argues that the providers' FY 2004 and 2005 contract claims are barred by the three-year statute of limitations in RSA 508:4. We disagree.

██ ██ A statute of limitations is tolled during a pending administrative proceeding if that proceeding is a prerequisite to a civil action. *See Dobe v. Comm'r, N.H. Dep't of Health & Human Services*, 147 N.H. 458, 461-62 (2002). Under the exhaustion doctrine, parties are required to pursue their claims at the administrative level before seeking judicial review. *N.H. Div. of Human Services v. Allard*, 138 N.H. 604, 607 (1994). This doctrine applies here. In 2004 the providers sought a declaratory judgment, which was dismissed precisely because the providers brought their claim prior to appealing the rates to the hearing panel. *See N.H. Partners in Service v. N.H., Div. of Children, Youth and Families*, No. 04-E-0145 (N.H. Super. Ct. 2004). Therefore, because the providers were required to go to the hearing panel prior to pursuing their civil claims, the statute of limitations was

tolled until the panel's decisions were final — March 6, 2006 for FY 2004 and December 28, 2005 for FY 2005, the dates on which the panel denied the providers' motions for reconsideration. Within three years, on December 5, 2008, the providers raised their contract claims and thus RSA 508:4 does not bar them.

The superior court suggested that the hearing panel's decisions were not final, and thus that the statute of limitations was tolled until June 8, 2007, when we issued our opinion reviewing the hearing panel's FY 2004 and 2005 decisions. *See Petition of Chase Home for Children*, 155 N.H. 528 (2007). If the statute of limitations began to run on June 8, 2007, the providers' contract claims were still brought within the three-year statute of limitations. We thus need not decide when the hearing panel decisions became final, for under both scenarios the providers timely filed their contract claims.

DCYF also claims that the providers did not raise their breach of contract claims until May 19, 2009, the date on which the providers filed their Second Amended Bill of Complaint. This is incorrect. In their First Amended Bill of Complaint, on December 5, 2008, the providers expressly claimed that DCYF's actions "constitute a breach of [DCYF's] contracts with [the providers]."

*C. Separation of Powers and RSA 9:19*

DCYF argues that the trial court's order requiring it to compensate the providers is barred by the doctrine of separation of powers and RSA 9:19. We do not agree.

As a State agency, DCYF is cloaked with the State's sovereign immunity. *Opinion of the Justices*, 101 N.H. 546, 547-48 (1957). It thus enjoys immunity from suit in New Hampshire courts. *See* RSA 99-D:1 (2001). This means that New Hampshire courts do not have subject matter jurisdiction to hear cases against DCYF unless there is an applicable statute waiving immunity. *Lorenz v. N.H. Admin. Office of the Courts*, 152 N.H. 632, 634 (2005). A statute can waive immunity either "expressly or by reasonable implication." *State v. Brosseau*, 124 N.H. 184, 190 (1983) (quotation omitted). Such waivers, however, are strictly construed. *Id.* They must evidence "a clear intent to grant a right to sue" the State. *Chasse v. Banas*, 119 N.H. 93, 96 (1979).

The trial court relied upon RSA 491:8 in finding that the State waived its immunity as to the contract claims. RSA 491:8 provides:

> The superior court shall have jurisdiction to enter judgment against the state of New Hampshire founded upon any express or

implied contract with the state. Any action brought under this section shall be instituted by bill of complaint and shall be tried by the court without a jury. The jurisdiction conferred upon the superior court by this section includes any set-off, claim or demand whatever on the part of the state against any plaintiff commencing an action under this section. The attorney general, upon the presentation of a claim founded upon a judgment against the state, shall submit the claim to the department or agency which entered into the contract, and said department or agency shall manifest said claim for payment from the appropriation under which the contract was entered into; provided, that if there is not sufficient balance in said appropriation, the attorney general shall present said claim to the general court for the requisite appropriation.

RSA 491:8 (2010). The clear intent of RSA 491:8 is to grant a right to sue the State for breach of contract. The jurisdictional grant permits the superior court "to enter judgment against the state of New Hampshire founded upon any express or implied contract with the state." *Id.* The statute specifically outlines the mechanics of such an action. *Id.* It requires a bench trial. *Id.* It requires the judgment to be paid out of the relevant appropriation. *Id.* If that appropriation contains an insufficient balance, then it directs the attorney general to present the judgment to the General Court. *Id.* In sum, RSA 491:8 is an express and detailed waiver of sovereign immunity directly applicable here, as this is a breach of contract dispute.

RSA 491:8 does not just waive sovereign immunity, though; it also answers DCYF's separation of powers argument. Part I, Article 37 of the New Hampshire Constitution provides that "the legislative, executive, and judicial, ought to be kept as separate from, and independent of, each other, as the nature of a free government will admit." This clause "is violated only when one branch usurps an *essential* power of another." *Duquette v. Warden, N.H. State Prison*, 154 N.H. 737, 747 (2007). The State's sovereign immunity statute, RSA 99-D:1, prevents state courts from entering judgments against the State. RSA 491:8, however, waives that immunity. The statute is thus a specific legislative authorization for the judiciary to enter judgment against the State of New Hampshire in contract disputes. Therefore, when the superior court enters a judgment against the State pursuant to RSA 491:8, the judicial branch is not usurping an essential power of another branch; rather, it is dutifully following a statutory command. Accordingly, the waiver in RSA 491:8 nullifies any potential separation of powers problems.

Our holding, moreover, is consistent with that of other courts. Many states have statutes that waive sovereign immunity in contract disputes. *See, e.g.,* Alaska Stat. § 09.50.250 (Lexis 2010); Ky. Rev. Stat. Ann. § 45A.245 (Michie 2007); Md. Code Ann., State Gov't § 12-201 (2009). Those states have had little difficulty in holding that their respective statutes mean what they say — that the state can be held liable for breach of contract. *See, e.g, State v. Haley,* 687 P.2d 305, 318 (Alaska 1984) ("By enacting section 250, the legislature has exercised its authority, pursuant to Alaska Const. art. II, § 21, to waive the State's immunity to suits asserting contract claims against it."); *Commonwealth v. Whitworth,* 74 S.W.3d 695, 699 (Ky. 2002) ("KRS 45A.245(1) waives sovereign immunity for a lawfully authorized written contract."); *Beka v. Board of Ed.,* 18 A.3d 890, 901 (Md. 2011) (holding that "the contract was duly executed and falls within the waiver of sovereign immunity provided by S.G. § 12-201(a)").

Indeed, a few state courts have gone so far as to hold that every time a state enters into an authorized contract it implicitly waives sovereign immunity. *See, e.g., Ace Flying Service v. Colorado Dept. of Agriculture,* 314 P.2d 278, 280-81 (Colo. 1957); *Grant Construction Co. v. Burns,* 443 P.2d 1005, 1009-10 (Idaho 1968); *Smith v. State,* 222 S.E.2d 412, 423-24 (N.C. 1976). As a justification for this rule, one court has said that "[t]he very antithesis of responsibility by government would be to say that it may contract with a citizen and assume obligations under the contract and then be permitted to disavow and say to the citizen that the State has breached the contract but you can't do anything about it because the government has not expressly consented to the maintenance of the suit." *V. S. DiCarlo Construction Co., Inc. v. State,* 485 S.W.2d 52, 57 (Mo. 1972). Today we do not go so far. We are merely acting pursuant to RSA 491:8, and in doing so follow the course of other state courts acting under similar statutes.

■ Finally, DCYF argues that the superior court's order violates RSA 9:19 because it requires the department to pay rates in excess of appropriations. RSA 9:19 states that "[n]o state official . . . shall . . . in any way bind the state in excess of the amount voted by the legislature." RSA 9:20 goes on to say that any person who violates RSA 9:19 may be personally liable for the amount of excess expended above appropriations. Thus, RSA 9:19 and RSA 9:20 create personal liability for state officials who enter into contracts that are not covered by appropriations.

■ RSA 9:19 does not, as DCYF argues, prevent New Hampshire courts from entering judgments against the State that award damages in an amount greater than appropriations. RSA 491:8 instructs the attorney general to present a breach of contract judgment to the General Court if there are insufficient appropriations to cover that judgment. DCYF's

interpretation of RSA 9:19 would make this part of RSA 491:8 superfluous. The attorney general would never have to go to the General Court to satisfy such a judgment — RSA 9:19 would prevent the superior court from entering it in the first place. We interpret statutes to give meaning to every word and phrase. *State v. Duran*, 158 N.H. 146, 155 (2008). The more reasonable interpretation is that RSA 491:8 contemplates that the General Court will appropriate money to cover such a judgment, while RSA 9:19 and RSA 9:20 give the attorney general the power to sue the state official who entered into the contract in order to cover that appropriation. Therefore, RSA 9:19 does not bar the providers' claims.

As to DCYF's remaining arguments, we need not decide whether there is a private cause of action under RSA chapters 169-B, 169-C and 169-D because our breach of contract holding is dispositive. We also need not address the good faith and fair dealing issue because the superior court's ruling on this issue had no effect on the damages awarded to the providers.

In conclusion, we hold that the legislature has specifically authorized the courts to enter a monetary judgment against the State when it breaches a contract. To hold otherwise would require us to ignore these legislative directives and to permit a State agency to disregard its contractual obligations. Such a result finds no support in New Hampshire law. Furthermore, the functionality of state institutions depends on the trust and confidence of New Hampshire citizens. Allowing the State to disregard its contractual obligations would undermine this trust. Accordingly, we affirm the superior court's order requiring DCYF to pay the providers $3,553,479.55.

*Affirmed.*

DALIANIS, C.J., and HICKS and LYNN, JJ., concurred.