Original
No. 88-051

## PETITION OF BRENDA STRANDELL
### (New Hampshire Division of Mental Health and Developmental Services)

August 16, 1989

*Peter K. Marsh*, of Concord, by brief and orally, for the petitioner.

*Stephen E. Merrill*, attorney general (*Emily Gray Rice*, assistant attorney general, and *Martha Pyle Farrell*, attorney, on the brief, and *Ms. Farrell* orally), for the Division of Mental Health and Developmental Services.

*Disabilities Rights Center, Inc.*, of Concord (*Ronald K. Lospennato* on the brief), by brief *pro se*, as *amicus curiae.*

THAYER, J. The petitioner, Brenda Strandell, petitions this court for a writ of certiorari to review a decision of the New Hampshire Division of Mental Health and Developmental Services (the Division) upholding the validity of New Hampshire Administrative Rule He-M 503.07(c). The regulation establishes a priority waiting list for developmentally disabled persons who apply for, and are entitled to receive, certain habilitative services pursuant to RSA 171-A:13 (Supp. 1988), when such services are currently unavailable. The petitioner claims that the director of the Division erred: (1) in ruling that her statutory entitlement to habilitative services had been "impliedly repealed" by insufficient legislative appropriations; and (2) in ruling that Administrative Rule He-M 503.07 was lawfully promulgated. The Disabilities Rights Center, as *amicus*

*curiae*, argues that the petitioner's right to habilitative services is grounded in the due process clause of the fourteenth amendment to the United States Constitution. This constitutional claim was not raised by the parties either below or on appeal, however, and we decline to address it here. *Appeal of Town of Hampton Falls*, 126 N.H. 805, 814, 498 A.2d 304, 310 (1985). For the reasons that follow, we dismiss the petition.

The petitioner, now thirty-seven years old, was admitted to the New Hampshire Hospital in 1973 and currently resides there. She has organic brain damage of uncertain etiology and is eligible for services under RSA chapter 171-A (Supp. 1988) as a developmentally disabled client. *See* RSA 171-A:2, II, V (defining developmentally disabled client).

On July 15, 1987, the petitioner's legal guardian applied to Monadnock Developmental Services Inc. (Monadnock) for a community placement and other habilitative services pursuant to RSA 171-A:6 (Supp. 1988) and Rule He-M 503.04. Monadnock is the area agency, RSA 171-A:2, I-b (Supp. 1988), serving geographic Region V as part of the comprehensive State service delivery system established to provide services to developmentally disabled persons. *See* RSA 171-A:4, :18 (Supp. 1988). Although the petitioner, due to her extended institutionalization, has no strong ties to any particular geographic location, *see* RSA 171-A:6, I (Supp. 1988) (applicants shall apply to area agency in their appropriate geographic location), a member of the Division advised her to apply to the Region V agency for services because of its reputation for developing and delivering high quality services to developmentally disabled clients with unique needs, and because it was the region where her eventual placement would most likely occur.

Following a comprehensive screening evaluation, Monadnock determined that the petitioner was eligible for services and that she would benefit from a placement in a less restrictive environment than the New Hampshire Hospital, most appropriately a small community residence with a high degree of individual attention. However, Monadnock determined that it could not provide such a placement due to lack of funding from the Division, and instead placed the petitioner on a waiting list for services, pursuant to Rule He-M 503.07(c). Because of her out-of-region status, the petitioner was assigned to a "fifth priority" category under this rule. As of October 1987, there were fifteen persons with higher priority status than the petitioner waiting for residential placement through the Monadnock agency.

The petitioner appealed Monadnock's decision to the division of mental health and developmental services pursuant to Administrative Rule He-M 302.09, which provides an administrative complaint process for the adjudication of claims relative to the delivery of services to developmentally disabled clients. The petitioner asserted in her appeal that because the legislature did not expressly condition the services guarantees set forth in RSA 171-A:13 (Supp. 1988) on the availability of resources, the promulgation of any administrative rule which resulted in a client's not receiving necessary services was "invalid and unlawful."

Following a hearing, the director of the Division issued a written decision on the petitioner's claim. The director determined that Monadnock's recommendation for placement of the petitioner in a community residence was appropriate, but found that "[t]here was no evidence to indicate that [the Division] was able to allocate the funds to [Monadnock] to provide [the petitioner] with the services she requires." In addition, the director ruled that "the appropriation made to [the Division] is determined by the legislature," and that the "budgetary system is thus the legal limit upon [the Division] which is, in effect, a restriction of the service guarantees in RSA 171-A:13." The director further determined that the promulgation of Rule He-M 503.07(c), establishing an "awaiting placement" status, was a valid exercise of the administrative authority of the Division "in conformance with the direction of the Legislature." The petitioner's fifth priority assignment was not an issue on appeal. The petitioner then petitioned this court for review of the director's decision.

The petitioner argues that: (1) the director erred in ruling that her statutory entitlement to services had been "impliedly repealed" by the insufficient budget appropriation; and (2) the Division's promulgation of the regulation establishing a priority system was "an unconstitutional administrative usurpation of legislative powers."

We first address the petitioner's claim relative to implied repeal. RSA 171-A:13 (Supp. 1988) confers upon developmentally disabled persons a right to receive habilitative services through a comprehensive State delivery system. The statute provides in relevant part:

"Every developmentally disabled client has a right to adequate and humane habilitation and treatment including such psychological, medical, vocational, social, educational or rehabilitative services as his condition requires to bring

about an improvement in condition within the limits of modern knowledge."

RSA 171-A:13 (Supp. 1988); *see also* RSA 171-A:4 (Supp. 1988). The petitioner contends that the director ruled that this entitlement had been "impliedly repealed" when he found that the extent of legislative appropriations is the "legal limit" upon the Division's authority to expend or encumber funds to implement the statute and thus a "restriction of the service guarantees in RSA 171-A:13." She argues that this ruling was erroneous because the legislature did not intend to repeal RSA 171-A:13, and because, in any event, it would have been unconstitutional for the legislature to do so through budget legislation. Because the doctrine of implied repeal is not favored in New Hampshire, *see Arnold v. City of Manchester*, 119 N.H. 859, 863, 409 A.2d 1322, 1325 (1979); *Opinion of the Justices*, 107 N.H. 325, 328, 221 A.2d 255, 257 (1966), according to the petitioner, the Division has failed to meet its substantial burden of proving an implied repeal.

We do not construe the director's decision as the petitioner does; *i.e.*, as a ruling that the statute had been impliedly repealed. Rather, we interpret the director's order as a recognition that the ability and the authority of the Division to implement the service guarantees of RSA 171-A:13 (Supp. 1988) is inherently limited by the amount of funds appropriated for that purpose.

 In any event, were we to construe his decision as a finding that RSA 171-A:13 (Supp. 1988) had been impliedly repealed, we agree with the petitioner that such a ruling would indeed be erroneous. Although the legislative appropriation apparently did not provide sufficient resources to enable the Division to implement the entire statutory program contemplated by RSA chapter 171-A (Supp. 1988) during a particular fiscal period, the appropriation did not substantively repeal that statutory program. *Cf. TVA v. Hill*, 437 U.S. 153, 190 (1978) (doctrine disfavoring repeal by implication applies with greater force to appropriations acts than to substantive acts because appropriations acts have limited and specific purpose of providing funds for authorized programs). Taking such a construction to its logical end, were the legislature to appropriate additional funds through a supplemental appropriation, would it be required to reenact an entitlement statute? We do not believe the legislature intended such a result. "An appropriations bill which 'defines no rights' certainly cannot abolish or amend existing law." *Flanders v. Morris*, 88 Wash. 2d 183, 188, 558 P.2d 769, 773 (1977). In distinguishing between

substantive enactments and appropriations measures, the court in *Flanders v. Morris* noted that:

> "'An appropriation bill is not a law in its ordinary sense. It is not a rule of action. It has no moral or divine sanction. It defines no rights and punishes no wrongs. ... It is a means only to the enforcement of law, the maintenance of good order, and the life of the state government.'"

*Id.* at 187–88, 558 P.2d at 773 (citation omitted); *see also Benjamin v. Devon Bank*, 68 Ill. 2d 142, 147–48, 368 N.E.2d 878, 881 (1977) (distinguishing substantive law and appropriations bills). Thus, to the extent that the director's decision could be construed as a finding of an implied repeal, we would merely reverse that ruling as an error of law.

██ Having said that, it does not follow that we must therefore hold that the Division has an absolute obligation to provide immediate and unlimited services to the petitioner, as she suggests. As a practical matter, the ability of the Division to implement the statute to its fullest extent may at some level be limited by the availability of resources. It is well established that the executive branch may expend public funds only to the extent, and for such purposes, as those funds may have been appropriated by the legislature. *See State v. Kimball*, 96 N.H. 377, 380, 77 A.2d 115, 119 (1950); N.H. CONST. pt. II, art. 56; RSA 9:19. As we have stated:

> "[T]he Legislature has a practical check upon the ... executive in the matter of appropriations ... that are made on a year to year basis. In appropriating or not appropriating money ... for the carrying out of particular services, the Legislature has a fundamental control' ... subject to a recognition of what funds ... are reasonably necessary for the exercise of powers inherent to the proper functioning of the three branches of government."

*Opinion of the Justices*, 118 N.H. 582, 589, 392 A.2d 125, 130 (quoting *Opinion of the Justices*, 96 N.H. 517, 529, 83 A.2d 738, 746 (1950) (Johnston, C.J., Kenison, J.)); *see also Ass'n for Retarded Citizens v. Dept. of Dev.*, 696 P.2d 150, 155, 211 Cal. Rptr. 758, 763 (1985) (recognizing that administrative bodies "may spend no more money to provide services than the Legislature has appropriated").

The petitioner argues, however, that the right to habilitative services set forth in RSA 171-A:13 (Supp. 1988) may not be in any way conditioned upon the current availability of resources, because no such condition is contained in the express language of the

statute. In support of this claim, the petitioner draws our attention to an analogous statute which grants treatment rights to severely mentally disabled persons through the State mental health services system. *See* RSA 135-C:13 (Supp. 1988). The legislature in 1986 repealed RSA 135-B:43, which had employed language virtually identical to that of RSA 171-A:13 (Supp. 1988) in providing treatment rights to all mentally ill persons, and enacted RSA 135-C:13 which provides that severely mentally disabled persons have a right to "... services which are necessary and appropriate ... and which are available within the state mental health services system." RSA 135-C:13 (Supp. 1988). The current statute further states that "[i]f necessary services are not available, ... each agency responsible for the provision of such services shall notify the division of the need for them, and the division shall utilize such information for budgetary planning purposes." *Id.* The petitioner argues that where the legislature expressly conditioned the service guarantees of the mentally disabled services statute upon the availability of funding, and included no similar condition in the developmentally disabled services statute, the legislature did not intend that such a condition apply to the latter.

The petitioner's argument is flawed in several respects. The legislature, in enacting RSA 135-C:13 (Supp. 1988), evidently deemed it appropriate to limit eligibility for services to severely mentally disabled clients, and to limit the services guaranteed under the statute to those which are available through the State mental health services system. However, the legislature did not address the question of the extent to which the availability of services, even for this limited class of beneficiaries, would be affected by the amount of money appropriated. Moreover, the petitioner's claim ignores the inherent constitutional limitations on the authority of the executive branch to expend public funds. *See State v. Kimball*, 96 N.H. at 380–81, 77 A.2d at 119.

Finally, we note that we do not find the petitioner's reliance upon *State v. Brosseau*, 124 N.H. 184, 470 A.2d 869 (1983) persuasive here. In *Brosseau*, this court held that the legislature in enacting RSA 171-A:13 impliedly waived sovereign immunity as to tort claims brought by institutionalized patients against the State for money damages. *Id.* at 187, 470 A.2d at 871. We reasoned that because RSA 171-A:13 "grant[s] to ... 'developmentally [disabled] clients' of State mental health facilities 'a right to adequate and humane treatment,'" the statute "'imposes a duty' upon State agents to provide that quality of care," the breach of which duty "will create a cause of action for damages in tort." *Id.* at 190–91, 470

A.2d at 873–74. In *Brosseau* the alleged breach was the negligent and abusive treatment of several institutionalized patients which resulted in their deaths. The petitioner in this case does not allege that she has been negligently treated while a resident of the New Hampshire Hospital; nor does she seek money damages. Rather, she requests this court, in light of the Division's apparent inability to provide the optimal habilitative services to all eligible clients, to order the Division to "provide habilitative services to all clients ... up to the amount of funds appropriated" and to "bring any projected shortfall to the immediate attention of the legislature" for guidance in resolving the dilemma. For the reasons discussed below, however, we decline to issue such an order.

Because we hold that RSA 171-A:13 (Supp. 1988) has not been impliedly repealed, we need not address the petitioner's claim that an implied repeal through a budget appropriation would violate part II, article 18-a of the New Hampshire Constitution.

The second issue raised by the petitioner is whether the promulgation of Rule He-M 503.07(c) was an unlawful exercise of legislative power. The rule establishes an "awaiting placement" status for developmentally disabled clients who are otherwise eligible for habilitative services or community placements which are currently unavailable, and are not likely to become available within six months. N.H. ADMIN. RULES, He-M 503.07(c)(1). The rule requires area agencies to place clients on a waiting list for the proposed services, review the clients' needs every six months for any change in the need for or the availability of such services, consider the needs of these clients in developing any budget plans to redirect or expand services, and report to the Division on a quarterly basis regarding any services which are needed but currently unavailable. *Id.* The second part of the regulation establishes the following priority system for those clients who are "awaiting placement":

> "b. [sic] First Priority: Individuals who are at imminent risk of substantial harm or significant regression in developmental functioning due to lack of food, clothing, shelter, or inadequate supervision.
>
> a. [sic] Second Priority: Individuals who are in need of services in order to enable them to maintain themselves in their community and to avoid placement in a highly restrictive facility such as Laconia state school and training center, New Hampshire hospital, or Glencliff home for the elderly.

c. Third Priority: Individuals:

1. whose current services do not include the type and quality of staff, supports, and environment sufficient to meet the goals and objectives in the client's individual service plan;

2. whose current circumstances are not the least restrictive environment consistent with their needs; or

3. moving into the service area who have been receiving division-funded services in another service area.

d. Fourth Priority: Individuals for whom alternative circumstances are desired or necessary for any other reason.

e. Fifth Priority: Individuals who reside outside of the region who are not currently receiving area agency services."

N.H. ADMIN. RULES, He-M 503.07(c)(2). (These priorities, however, may not take precedence over placement of residents of the New Hampshire Hospital or the Laconia State School, where the area agency has specific placement requirements for such residents in its annual contract with the Division.) The petitioner challenges the Division's promulgation of this regulation as an "unconstitutional usurpation of legislative power."

 The constitutional doctrine of separation of powers limits the degree of rulemaking authority which the legislature may delegate to an administrative agency to that which is necessary to "fill in the details" of a statute in order to effectuate its purpose, see *Guillou v. State*, 127 N.H. 579, 582, 503 A.2d 838, 840 (1986); N.H. CONST. pt. I, art. 37. The delegating statute must contain some standards or general policy to guide the administrative agency in exercising its rulemaking authority. *See Guillou v. State, supra* at 581, 503 A.2d at 840. In this case, however, the petitioner does not challenge the constitutionality of the enabling statute as an impermissible delegation of legislative authority. *Cf. Guillou v. State supra*. Rather, she claims that the Division acted beyond its authority in promulgating the regulation and thus "usurped" legislative power. *See In re Richard M.*, 127 N.H. 12, 17, 497 A.2d 1200, 1203 (1985) (citations omitted).

The express purpose of RSA chapter 171-A is to "enable the division of mental health [and developmental services] to establish, maintain, implement and coordinate a comprehensive service delivery system for developmentally disabled persons." RSA 171-A:1 (Supp. 1988). RSA 171-A:3 (Supp. 1988) authorizes the director of the Division to adopt rules to implement this chapter. It is well settled, however, that "administrative officials do not possess the power to contravene a statute." *In re Richard M., supra* at 16, 497 A.2d at 1203 (quoting *Woodman v. Perrin,* 124 N.H. 545, 549, 474 A.2d 999, 1002 (1984)). If the Division acted "beyond the limited discretion granted by a valid enactment, the rule is invalid." *In re Richard M., supra* at 17, 497 A.2d at 1203 (quoting *Kimball v. N.H. Bd. of Accountancy,* 118 N.H. 567, 568, 391 A.2d 888, 889 (1978)). Administrative rules may not add to, detract from, or modify the statute which they are intended to implement. *Kimball v. N.H. Bd. of Accountancy, supra* at 568, 391 A.2d at 889.

The petitioner contends that because RSA 171-A:13 (Supp. 1988) grants the right to habilitative services to "every" client, any regulation which results in any client not immediately receiving recommended services necessarily contravenes the statute. We reject this broad contention because it ignores the constitutional restraints upon the authority of the executive branch to expend public funds, as discussed above. The petitioner argues, however, that where the statute is silent on how to address a funding shortfall, the Division was without power to address this problem by promulgating Rule He-M 503.07(c), because "[d]ecisions regarding how to reconcile public resources and public responsibilities are the essence of legislative power." We do not consider the director's authority to be so limited in this case.

The United States Supreme Court has recognized that when Congress creates a class of beneficiaries which is greater than that which can be served by the amount of resources available for that purpose, and when Congress is silent on how to resolve the predicament, the administering agency may establish reasonable classifications and priorities to allocate the limited resources. *See Morton v. Ruiz,* 415 U.S. 199, 230–31 (1974). The Court in *Morton v. Ruiz* provided an instructive example of such a situation:

> "Having found that the congressional appropriation was intended to cover welfare services at least to those Indians residing 'on or near' the reservation, it does not necessarily follow that the Secretary is without power to create reasonable classifications and eligibility requirements in

order to allocate the limited funds available to him for that purpose.... Thus, if there were only enough funds appropriated to provide meaningfully for 10,000 needy Indian beneficiaries and the entire class of eligible beneficiaries numbered 20,000, it would be incumbent upon BIA to develop an eligibility standard to deal with this problem, and the standard, if rational and proper, might leave some of the class otherwise encompassed by the appropriation without benefits."

*Morton v. Ruiz supra.* Here, where the amount of funds appropriated by the State legislature was insufficient to provide services to all of the beneficiaries contemplated by RSA 171-A:13 (Supp. 1988), it was within the director's authority to create a reasonable priority system to facilitate the distribution both of appropriated funds and of any additional funds that may become available by supplemental appropriation or otherwise, although the system established might result in a particular client not immediately receiving services. This is not an impermissible modification of the statute, but rather a means of implementing it to the fullest extent possible in light of the limited resources available for that purpose.

We further find uncompelling the petitioner's suggestion that the priority system set forth in Rule He-M 503.07(c)(2) contravenes the legislative policy underlying RSA chapter 171-A, to accommodate the de-institutionalization of clients placed in overly restrictive institutional settings. The petitioner contends in her brief that "a strong argument may be made" that if the *legislature* had established a priority system, the accommodation of institutionalized clients like herself "would [have been] a *first priority*," whereas under the director's system, "she is a *last priority*." (Quoted emphasis in original.) We note that the petitioner has not contested her placement in the fifth priority category, and that issue is not before us. Moreover, a review of the regulation set forth above reveals that the director contemplated this legislative policy in establishing the priority system. *See* N.H. ADMIN. RULES, He-M 503.07(c)(2)(a) (second priority includes individuals seeking to avoid placement in highly restrictive facilities); *id.* 503.07(c)(2)(c)(1), (2) (third priority includes individuals not currently placed in the least restrictive environment consistent with their needs or whose current services are insufficient to meet the goals of their individual service plans); *id.* 503.07(c)(2)(d) (fourth priority includes individuals for whom alternative circumstances are necessary or desired for other reasons). The remaining priority criteria merely recognize the immediacy of certain clients' needs, *see id.*

503.07(c)(2)(b) (first priority includes individuals at imminent risk of harm due to lack of food, clothing, shelter, or supervision), and reflect the geographic area agency structure of the State service delivery system, *see id.* 503.07(c)(2)(c)(3) (third priority includes individuals previously receiving division-funded services in other service areas); *id.* 503.07(c)(2)(e) (fifth priority includes out-of-region individuals not currently receiving area agency services). *See generally* RSA 171-A:16, :18 (Supp. 1988).

The petitioner also urges us to strike down the regulation on another ground. She asserts that when the legislature fails to appropriate sufficient funds to enable the Division to serve all eligible clients, the director has an affirmative duty to then seek a transfer or reallocation of appropriated funds or seek a supplemental appropriation from the legislature, and may not "circumvent" this obligation by merely placing certain clients on a waiting list until additional funds become available.

We note initially that the existence of Rule He-M 503.07(c) in no way *prohibits* the director from attempting to obtain additional funding through any of the established methods, including seeking transfers or supplemental appropriations from the legislature, and we will not presume that the director would refuse to employ available methods of obtaining funds in instances where their use is both feasible and appropriate.

The petitioner argues, however, that the transfer provisions of RSA 9:16-a and RSA 9:17 confer upon the director a mandatory duty, enforceable by this court, to attempt to transfer funds in all circumstances. RSA 9:16-a authorizes every executive department to transfer funds between program appropriation units within the department, subject to the approval of both the Governor and Council and the fiscal committee. For example, within the department of health and human services, funds appropriated for use by the division of mental health and developmental services might be transferred to the division for children and youth services to fill a particular need. According to RSA 9:17, the Governor and Council may authorize the commissioner of administrative services to transfer or reallocate funds within a division or a subunit of a department as "may be necessary or desirable to best carry out the purpose" of that division.

In this case, the director found that "[t]here was no evidence to indicate that [the Division] was able to allocate funds to [Monadnock] to provide [the petitioner] with the services she requires," and the petitioner has not contested this finding. Thus, we do not address the possibility or the appropriateness of a

transfer or reallocation of funds within the division itself. With regard to a transfer of funds from another division within the department, the record is silent as to whether any was sought or effected in this case, although the parties agree that such transfers have in the past been a valuable resource in helping to alleviate budget crises within the various divisions. In any event, we need not remand for further factual findings on this issue, because the plain language of RSA 9:16-a indicates that the transfer procedure is discretionary. *See* RSA 9:16-a (transfers "authorized" rather than mandated); *see also* RSA 9:17 (Governor and Council "may" authorize transfers). The need for discretion in transferring funds stems from the fact that any reallocation of funds to a particular class of beneficiaries requires the removal of those funds from another class of beneficiaries. It would be improvident for this court to find the application of those provisions to be mandatory in all circumstances, because to do so would be to substitute the judgment and control of the court for the judgment and control of those who are by law vested with the responsibility of administering these programs.

Finally, the parties cannot realistically dispute the fact that the Division might still find itself in a position of being unable to provide services to all eligible developmentally disabled clients, even if it had employed all potential means of obtaining funds, including seeking, or for that matter obtaining, a supplemental appropriation from the legislature. We hold, therefore, that the promulgation of Administrative Rule He-M 503.07(c) was a valid exercise of the director's authority to provide a necessary and reasonable means of implementing the statutory mandate of RSA 171-A:13 (Supp. 1988) to the fullest extent possible in an environment of limited resources.

*Petition dismissed.*

All concurred.