NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2020-0454

JANE DOE

v.

COMMISSIONER OF THE NEW HAMPSHIRE DEPARTMENT OF HEALTH AND HUMAN SERVICES

Argued: March 25, 2021
Opinion Issued: May 11, 2021

Simpson & Mulligan, P.L.L.C., of Lebanon (Gary Apfel on the brief and orally), for the plaintiff.

Gordon J. MacDonald, attorney general (Anthony J. Galdieri, senior assistant attorney general, Daniel E. Will, solicitor general, and Samuel R.V. Garland, assistant attorney general, on the brief, and Mr. Galdieri orally), for the defendant.

American Civil Liberties Union of New Hampshire, of Concord (Gilles R. Bissonnette and Henry R. Klementowicz on the brief), and Weil, Gotshal & Manges LLP, of New York, New York (Theodore E. Tsekerides, Aaron J. Curtis, and Colin McGrath on the brief), for the class plaintiffs in John Doe v.

Commissioner, No. 1:18-CV-01039-JD (D.N.H.), in their individual capacities and on behalf of themselves and all others similarly situated, as amici curiae.

Law Office of Joshua L. Gordon, of Concord (Joshua L. Gordon on the brief), for National Alliance on Mental Illness New Hampshire, as amicus curiae.

Sheehan Phinney Bass & Green, P.A., of Manchester (Michael D. Ramsdell and James P. Harris on the brief), for New Hampshire Hospital Association & a., as amici curiae.

HICKS, J. The defendant, the Commissioner of the New Hampshire Department of Health and Human Services (DHHS), appeals an order of the Superior Court (Tucker, J.) denying her motion to dismiss and granting the petition for a writ of habeas corpus filed by the plaintiff, who appears under the pseudonym "Jane Doe." The plaintiff's petition sought her release from New Hampshire Hospital (NHH) on the ground that she failed to receive a probable cause hearing within three days of her involuntary emergency admission, as required by RSA 135-C:31, I (2015). The trial court ruled in her favor, and we affirm.

I. Factual Background

The following facts either were recited by the trial court or reflect the content of documents in the appellate record. On August 25, 2020, a resident physician of adult psychiatry prepared a complaint for a compulsory mental examination of the plaintiff. The resident averred that the plaintiff was "in need of involuntary emergency admission" as set forth in an accompanying petition and that she would not consent to a mental examination. A justice of the peace ordered the compulsory mental examination to take place and ordered law enforcement to take custody of the plaintiff and deliver her to the emergency room at Dartmouth-Hitchcock Medical Center in Lebanon (DHMC). Hanover police executed the order and brought the plaintiff to DHMC.

In the accompanying petition, the resident described the plaintiff's "specific dangerous acts or behaviors" demonstrating that she "so lack[ed] the capacity to care for [her] own welfare that there [was] a likelihood of death, serious bodily injury, or serious debilitation" if her involuntary emergency admission were not ordered. Physical and mental examinations of the plaintiff were conducted at the direction of a DHMC psychiatrist, who had been

2

approved by a qualifying community mental health center to certify involuntary admissions. That day, August 25, based upon her review of the results of those examinations and the plaintiff's conduct as described by the psychiatric resident, the psychiatrist signed a certificate for the plaintiff's involuntary emergency admission. The certificate stated that, in the psychiatrist's opinion, "the criteria of RSA 135-C:27 [were] satisfied, as the [plaintiff was] in such mental condition as a result of mental illness that [she] pose[d] a serious likelihood of danger to self or others." See RSA 135-C:27 (2015) (setting forth the criteria rendering a person eligible for involuntary emergency admission). The certificate did not identify the receiving facility that could "best provide" the plaintiff with the requisite "degree of security and treatment." See RSA 135-C:2, XIV (2015) (defining "receiving facility").

DHMC is not a receiving facility within the meaning of RSA 135-C:2, XIV. Moreover, although RSA 135-C:29, I, requires that a patient be "immediately" delivered to such a facility "[u]pon completion of an involuntary emergency admission certificate," the plaintiff was not delivered to a receiving facility for more than two weeks. RSA 135-C:29, I (Supp. 2020). Instead, because of a lack of receiving-facility beds, she was kept in the emergency room at DHMC for more than two weeks.

NHH is a receiving facility under RSA 135-C:2, XIV. See RSA 135-C:26, I (2015). According to the plaintiff, her attorney was advised on September 2, 2020, that there were 60 people then waiting for admission to NHH, and the plaintiff was "tenth in line." In a September 3, 2020 petition for a writ of habeas corpus seeking her release from DHMC, plaintiff's counsel stated that the plaintiff was being kept in a windowless room in the emergency department against her will. Plaintiff's counsel further stated that, despite being detained in the emergency room since August 25, 2020, the plaintiff had "not been provided with an involuntary emergency admission hearing before an independent fact finder" or been afforded "any opportunity to challenge whether there exist[ed] probable cause for her continued detention."

The plaintiff was delivered to NHH on September 11, 2020. On September 15, 2020, which was within three days of her arrival at NHH (not including Sundays and holidays pursuant to RSA 135-C:31, I), the plaintiff was given a probable cause hearing. September 15, 2020, was 17 days (not including Sundays and holidays) from the date on which the DHMC psychiatrist completed the certificate for the plaintiff's involuntary emergency admission.

The plaintiff filed a motion to dismiss the probable cause proceeding, arguing, among other things, that her involuntary emergency admission was unlawful because she had been held for 18 days at the DHMC emergency room without a probable cause hearing, had been "denied her statutorily mandated

three-day hearing," and had been "denied release within ten days of her initial confinement." As recommended by a Referee (B. Kissinger, R.), the Circuit Court (Spath, J.) denied the plaintiff's motion to dismiss and found probable cause for the plaintiff's involuntary emergency admission.

On September 16, 2020, the plaintiff brought the instant petition for a writ of habeas corpus seeking her release from NHH. She argued that her continued confinement in NHH was unlawful because, contrary to RSA chapter 135-C, she had been: (1) held "indefinitely" at the DHMC emergency room; (2) "denied prompt and adequate notice"; (3) "denied a three-day hearing"; (4) "denied review of the grounds of her confinement by an independent fact finder"; and (5) "denied the prospect of release within ten days of her initial confinement."

The defendant moved to dismiss the plaintiff's petition, arguing that the three-day period for providing a probable cause hearing does not begin to run until the person is delivered to a designated receiving facility. The superior court disagreed, concluding "that when RSA chapter 135-C is considered as a whole, the involuntary emergency admission and the rights accruing to those so admitted to the state mental health system are not tolled until the person arrives at the receiving facility, but are triggered when the [involuntary emergency admission] certificate is complete." The court observed that RSA chapter 135-C "contemplates the person's prompt delivery to a receiving facility without the delay that occurred here." The court concluded that, because the plaintiff did not receive a probable cause hearing until 17 days after the involuntary emergency admission certificate had been completed (not including Sundays and holidays), her continued confinement in NHH was unlawful, and ordered her release. This appeal followed.

II. Discussion

In an appeal from a grant of a petition for a writ of habeas corpus, we accept the trial court's factual findings unless they lack support in the record or are clearly erroneous, and review its legal conclusions de novo. See Barnet v. Warden, N.H. State Prison for Women, 159 N.H. 465, 468 (2009) (concerning the denial of a petition for a writ of habeas corpus); see also State v. Santamaria, 169 N.H. 722, 725 (2017) (applying the standard of review that we use in an appeal from the denial of a petition for a writ of habeas corpus to an appeal from the dismissal of a petition for a writ of coram nobis).

"The procedural prerequisite for a court's consideration of a petition for a writ of habeas corpus is an allegation of a present deprivation of a protected liberty interest." Brennan v. Cunningham, 126 N.H. 600, 603-04 (1985) (quotation omitted). "[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."

Addington v. Texas, 441 U.S. 418, 425 (1979); see In re Scott L., 124 N.H. 327, 330 (1983) (noting that "the deprivation of liberty inherent in civil commitment is subject to significant due process requirements"). Indeed, "[t]he private interests at stake in civil commitment proceedings, loss of liberty and social stigmatization, are substantial and parallel those at risk in the criminal context." In re Richard A., 146 N.H. 295, 298 (2001); see Addington, 441 U.S. at 425-26 (recognizing that "involuntary commitment to a mental hospital after a finding of probable dangerousness to self or others can engender adverse social consequences to the individual").

The trial court ruled that the plaintiff's continued confinement in NHH was unlawful because she "did not receive a probable cause hearing within three days of her emergency admission." On appeal, the defendant argues that the probable cause hearing in this case was timely because it occurred within three days (not including Sundays and holidays) of the plaintiff's admission to NHH. According to the defendant, an involuntary emergency admission does not occur until a patient is physically accepted at a receiving facility for mental health treatment. The defendant contends that "the . . . language, context, and structure" of pertinent RSA chapter 135-C provisions as well as DHHS' "longstanding administrative rules demonstrate that an [involuntary emergency admission] to the state mental health services system occurs when a patient is present at, accepted by, and therefore admitted to, a receiving facility."

The plaintiff counters that she did not receive a timely probable cause hearing because the hearing in this case took place 17 days from when the certificate for her involuntary emergency admission was completed. The plaintiff argues that her involuntary emergency admission was not to a specific facility, but rather was to the state mental health services system, and that her admission to the system took place as soon as the DHMC psychiatrist certified that the plaintiff was "in such mental condition as a result of mental illness that [she] pose[d] a serious likelihood of danger to self or others."

Resolving the issues in this appeal requires that we engage in statutory interpretation. We review the trial court's statutory interpretation de novo. Polonsky v. Town of Bedford, 171 N.H. 89, 93 (2018). We are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole. Id. We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. Id. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Id. We construe all parts of a statute together to effectuate its overall purpose and to avoid an absurd or unjust result. Id. Moreover, we do not consider words and phrases in isolation, but rather within the context of the statute as a whole, which enables us to better discern the legislature's intent and to interpret statutory language in light of

5

the policy or purpose sought to be advanced by the statutory scheme.  Id. "When a statute's language is plain and unambiguous, we need not examine its legislative history." Sutton v. Town of Gilford, 160 N.H. 43, 54 (2010).

A.  RSA chapter 135-C

We begin by reviewing the relevant statutory scheme, RSA chapter 135-C.  As the title to the chapter indicates, RSA chapter 135-C creates the "New Hampshire Mental Health Services System." (Bolding and capitalization omitted.)  The chapter enables DHHS to "[e]stablish, maintain, and coordinate a comprehensive, effective, and efficient system of services for persons with mental illness," RSA 135-C:1, I(a) (2015), "known as the mental health services system," Petition of Sawyer, 170 N.H. 197, 199 (2017).  See RSA 135-C:3 (2015).  The defendant supervises, and DHHS administers, the state mental health services system.  Id.; see Petition of Sawyer, 170 N.H. at 200.  "The policies, practices, and procedures laid out in the chapter are intended to create a comprehensive and efficient system for addressing mental health issues and treatment needs and for accomplishing the purposes and goals of the chapter," which include preventing "mentally ill persons from harming themselves or others." Doe v. Commissioner, New Hampshire Department of Health and Human Services, Civil No. 18-cv-1039-JD, 2020 WL 2079310, at *8 (D.N.H. April 30, 2020) (quotation omitted); see RSA 135-C:1, I(c) (2015).

The State delivers mental health services to eligible individuals through community mental health programs with which it contracts, see RSA 135-C:7 (2015), and through NHH and "any other facility approved by the [defendant]" and designated as a receiving facility.  RSA 135-C:26, I; see RSA 135-C:2, XIV (defining "receiving facility" as "a treatment facility which is designated by the [defendant] to accept for care, custody, and treatment persons involuntarily admitted to the state mental health services system").

RSA chapter 135-C establishes separate processes for voluntary and involuntary admissions.  For a voluntary admission, one must apply "to an approved community mental health program or to a receiving facility."  RSA 135-C:12, I (2015).  "The program or facility" to which the person has applied "shall determine the [applicant's] eligibility . . . to receive services from the state mental health services system and shall notify the applicant of the eligibility decision within 15 days after receipt of the application."  RSA 135-C:12, III (2015).  A person who is "severely mentally disabled" is automatically eligible for admission to the state mental health services system.  See RSA 135-C:13 (Supp. 2020), :2, XV (2015) (defining "severely mentally disabled" for the purposes of RSA chapter 135-C).

The provisions regarding involuntary admissions include general provisions that apply to both emergency and non-emergency involuntary

6

admissions, see RSA 135-C:20-:26 (2015); provisions that apply only to involuntary emergency admissions, see RSA 135-C:27-:33 (2015 & Supp. 2020); and provisions that apply only to involuntary non-emergency admissions, see RSA 135-C:34-:54 (2015 & Supp. 2020). Because this appeal concerns an involuntary emergency admission, we focus upon the provisions governing such admissions.

"The involuntary emergency admission of a person shall be to the state mental health services system under the supervision of the [defendant]." RSA 135-C:28, I (Supp. 2020). A person is "eligible for involuntary emergency admission if he [or she] is in such mental condition as a result of mental illness to pose a likelihood of danger to himself[, herself,] or others." RSA 135-C:27. Such admission "may be ordered upon the certificate of an approved" medical service provider, provided that, within three days, the provider either has conducted, or has caused to be conducted, a mental examination of the person, and, depending upon the circumstances, a physical examination. RSA 135-C:28, I. The approved medical service provider "must find that the person to be admitted meets the criteria of RSA 135-C:27." Id. The defendant is required to "maintain a list" of all such approved medical service providers. Id.

In addition, the certificate must detail the examinations conducted and state the specific act or actions of the person that satisfy the criteria of involuntary emergency admission. Id. Moreover, the approved medical service provider must "inform the person of the designated receiving facility in the mental health services system" to which he or she will be transported "upon the facility location being identified." Id.

"Upon completion of an involuntary emergency admission certificate under RSA 135-C:28, a law enforcement officer shall," except under circumstances not relevant to the instant case, "take custody of the person to be admitted and shall immediately deliver such person to the receiving facility identified in the certificate." RSA 135-C:29, I. "Following completion of an involuntary emergency admission certificate . . . and before custody of the person is accepted by a law enforcement officer . . . , the certificate may be rescinded and the person who is the subject of the certificate released" if: (1) transfer of the person's care is accepted by "[a] mobile crisis team" under contract with DHHS, an "assertive community treatment team operated by a community mental health program," or a "community-based provider"; or (2) the approved medical service provider who completed the certificate "finds that the person no longer meets the criteria of RSA 135-C:27." RSA 135-C:29-a, I, II (Supp. 2020).

"Before any judicial hearing" on the propriety of a person's involuntary admission "commences, the client or the person sought to be admitted shall be given written and oral notice" of his or her right to be represented by counsel

and to have appointed counsel if he or she is indigent.  RSA 135-C:24 (2015); see RSA 135-C:22 (2015) (entitling "a client or a person sought to be admitted to a program or facility to legal counsel prior to and during any judicial hearing" conducted under RSA chapter 135-C).  "At the receiving facility, any person sought to be involuntarily admitted for involuntary emergency admission shall be given immediate notice" by the facility administrator or his or her designee about the right to counsel, to have appointed counsel if the person is indigent, to apply for admission on a voluntary basis, and to consult with counsel.  RSA 135-C:30, I-IV (2015).  The person must be given written notice of these rights within 12 hours.  Id.

"Within 3 days after an involuntary emergency admission, not including Sundays and holidays, and subject to the notice requirements of RSA 135-C:24, there shall be a probable cause hearing in the [circuit court] having jurisdiction to determine if there was probable cause for involuntary emergency admission."[1]  RSA 135-C:31, I.  At the probable cause hearing, the burden is on the petitioner to show that probable cause existed for the involuntary emergency admission.  Id.  The court is required to issue its decision as soon as possible, "but not later than the end of the court's next regular business day."  Id.

"If a receiving facility has not been designated to receive or maintain custody following a probable cause hearing" of a person who has been involuntarily admitted on an emergency basis, "the facility shall, within 24 hours, transfer the person to a receiving facility which has the proper designation."  RSA 135-C:31, V (2015).

Under RSA 135-C:32, a person shall not be admitted for an involuntary emergency admission "for longer than a 10-day period, not including Saturdays and Sundays, unless: (1) a subsequent petition for involuntary emergency admission" containing allegations of specific acts or actions occurring after the initial involuntary emergency admission is completed and the admission is ordered by an approved medical service provider; or (2) a request for a judicial hearing on the issue of involuntary admission under RSA 135-C:34-:54 has been timely filed with the circuit court.  RSA 135-C:32 (Supp. 2020); see RSA 490-F:18.  A person who has been involuntarily admitted on an emergency basis must be discharged when: (1) there has been a finding of no probable cause by the court, see RSA 135-C:31, I; or (2) the administrator of a receiving

---

[1] Although RSA chapter 135-C refers to the "district court" and the "probate court," those references are "deemed to be to the New Hampshire circuit court" pursuant to RSA 490-F:18.  See RSA 490-F:18 (Supp. 2020).  The circuit court is a court with statewide jurisdiction, RSA 490-F:1 (Supp. 2020), and consists of three divisions: a probate division, a district division, and a family division.  RSA 490-F:3 (Supp. 2020). "The circuit court shall have the jurisdiction, powers, and duties conferred upon the former probate and district courts and upon the former judicial branch family division by RSA 547, RSA 502-A, and RSA 490-D."  Id.

facility has decided that the person no longer meets the criteria established by RSA 135-C:27.  RSA 135-C:33, I (2015).

B.  Constitutional Considerations

The doctrine of constitutional avoidance informs our construction of RSA chapter 135-C.  Under that doctrine, we will construe a statute "to avoid conflict with constitutional rights wherever reasonably possible."  State v. Ploof, 162 N.H. 609, 620 (2011) (quotation omitted).

RSA chapter 135-C contains "significant . . . safeguards" designed "to minimize the risk of erroneous deprivation of liberty due to civil commitment." In re Richard A., 146 N.H. at 299.  For instance, given that involuntary admissions "generally turn on medical evidence," the statutory scheme requires that such evidence be contemporaneous with the court hearing.  Id. (describing the process for an involuntary non-emergency admission).  For an involuntary emergency admission, the person must be examined within three days of the completion of the certificate for admission, see RSA 135-C:28, I, and be afforded a probable cause hearing within three days of his or her involuntary emergency admission, see RSA 135-C:31, I.

The statutory scheme "also incorporates safeguards to preserve the ability of the named individual to meaningfully contest the petition," In re Richard A., 146 N.H. at 299, such as the right to counsel, see RSA 135-C:22, and the right to notice about the right to counsel, see RSA 135-C:24.  See Vazquez-Robles v. CommoLoCo, Inc., 757 F.3d 1, 2 (1st Cir. 2014) (observing that "[n]o principle is more firmly embedded in American jurisprudence than this one:" when a state curtails a person's liberty, "that person is entitled to notice and an opportunity to be heard").  Moreover, even if a person is erroneously involuntarily detained on an emergency basis under RSA 135-C:27-:33, "the statutory scheme provides mechanisms for immediate release." In re Richard A., 146 N.H. at 299; see RSA 135-C:33, I.

C.  Analysis

We now turn to the issue in this case — whether the plaintiff's statutory rights under RSA chapter 135-C were violated because she did not receive a probable cause hearing until 17 days after she was certified for involuntary emergency admission.  Based upon our review of the statutory scheme and consistent with our duty to avoid interpreting the statute as unconstitutional, we conclude that the plaintiff's statutory rights were violated.

Under the plain meaning of RSA 135-C:28, I, a person is involuntarily admitted on an emergency basis to the "state mental health services system,"

not to a specific facility. RSA 135-C:29, I, requires that, "[u]pon completion of an involuntary emergency admission certificate," the person must be delivered "immediately" to the receiving facility identified in the certificate. See RSA 135-C:29, II (Supp. 2020) (providing that delivery may be by ambulance or law enforcement at the discretion of the "health care provider who is authorized to order involuntary emergency admission"). The plain language of RSA 135-C:31, I, entitles the person to a probable cause hearing within three days "after an involuntary emergency admission, not including Sundays and holidays." The time for a probable cause hearing, therefore, is triggered by the completion of a certificate, not by the person's delivery to a designated receiving facility.

These statutory provisions contemplate that a person's admission to the state mental health services system and delivery to a receiving facility are to take place nearly simultaneously. See RSA 135-C:29, I, II (requiring law enforcement or an ambulance to "immediately deliver" the person to a receiving facility "[u]pon completion of an involuntary emergency admission certificate"). As the United States District Court for the District of New Hampshire concluded in a similar case, "involuntary emergency admission into the mental health services system . . . occurs when an [involuntary emergency admission] certificate is completed. Following certification, the statutory procedures require immediate delivery of the certified person to a designated receiving facility and a probable cause hearing within three days after certification." Doe, 2020 WL 2079310, at *11.

Nothing in the statutory scheme allows a person to be held indefinitely pending delivery to a receiving facility. See id. at *9. "There is also no statutory requirement for re-examination, re-evaluation, or re-certification of the person when that person is delivered to a designated receiving facility, which underscores the conclusion that admission to the mental health services system has already occurred before delivery, that is, at the time of certification." Id.

Once the certificate for an involuntary emergency admission is completed, the person at issue is not free to leave, but, rather, is deemed to be in the custody of DHHS. Under RSA 135-C:29-a, a person for whom an involuntary emergency admission certificate has been completed may be released only if the certificate is rescinded "before custody of the person is accepted by a law enforcement officer." Thus, as the federal district court concluded in Doe:

> Completion of the [involuntary emergency admission] certificate carries with it immediate significant consequences. Certification establishes at the outset that the person is likely to be a danger to himself, herself, or others. Because of that determination, the

10

person is admitted to the state mental health services system under the supervision of the [defendant] and is at that point placed in the custody and control of the [defendant].

Id. (quotation omitted).

The plain and ordinary meaning of RSA 135-C:28, I, RSA 135-C:29, I, RSA 135-C:29-a, and RSA 135-C:31, I, read in light of the purpose of RSA chapter 135-C and in the context of the process for involuntary emergency admission as a whole, required that the plaintiff be transported to a receiving facility immediately upon being certified for involuntary emergency admission and that she be given a probable cause hearing within three days of that certification. Accordingly, we hold that the plaintiff's confinement in NHH violated RSA chapter 135-C because, upon being certified for involuntary emergency admission and, thus, being admitted to the state mental health services system, she did not receive a probable cause hearing within three days of her admission.

Relying upon dictionary definitions of the words "involuntary," "emergency," and "admission," the defendant argues that an involuntary emergency admission is "the act or practice of accepting someone into a treatment facility as an inpatient against her will because of a sudden or unexpected occurrence demanding prompt action." The defendant asserts that the receiving facility is the "treatment facility" and that, therefore, an involuntary emergency admission occurs when the receiving facility "accepts a patient for mental-health treatment on an inpatient basis against his or her will because of a sudden or unexpected occurrence demanding prompt action."

The defendant's interpretation rests upon construing certain words in isolation, instead of in context, which is contrary to our statutory interpretation principles. See Petition of Carrier, 165 N.H. 719, 721 (2013). The defendant's interpretation also ignores the plain language in RSA 135-C:28, I, which provides that involuntary emergency admission is "to the state mental health services system," not to a receiving facility. Moreover, the defendant's interpretation loses sight of "the policy or purpose sought to be advanced by the statutory scheme," id., which is to allow for the involuntary admission of a person on an emergency basis in appropriate circumstances consistent with the constitutional command that she receive due process. Although "we first look to the plain meaning of words to interpret statutes, it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary[,] but to remember that statutes always have some purpose or object to accomplish." Clare v. Town of Hudson, 160 N.H. 378, 384 (2010) (quotation omitted).

11

In addition, the defendant's construction "ignores the significance of the certification process and the logical progression of events provided by" RSA 135-C:27-:33. Doe, 2020 WL 2079310, at *10. "Certification is the mandatory first step in the admission process, which changes the legal status of the [involuntary emergency admission]-certified person." Id. Such a person "could not be taken into custody and delivered to a designated receiving facility without first being admitted to the mental health services system." Id. As envisioned by the legislature and as required by the plain meaning of the pertinent statutes, the process of an involuntary emergency admission is intended "to progress logically" and seamlessly "through a series of steps," beginning with the completion of an involuntary emergency admission certificate, continuing with immediate delivery to a receiving facility, and ending with the probable cause hearing. Id.

The defendant observes that "[s]ince at least 1981, [DHHS'] administrative rules have reflected an understanding that an 'involuntary emergency admission' occurs upon physical presence at a designated receiving facility." The defendant urges us to defer to DHHS' longstanding interpretation of an "involuntary emergency admission" because it is the agency charged with administering RSA chapter 135-C. We decline to do so.

Although "it is well established in our case law that an interpretation of a statute by the agency charged with its administration is entitled to deference," that deference is not absolute. Appeal of Town of Seabrook, 163 N.H. 635, 644 (2012). We are still the final arbiter of the legislature's intent as expressed in the words of the statute considered as a whole. Id. And, we will not defer to an agency's statutory interpretation when, as in this case, it clearly conflicts with the statutory language or is plainly incorrect. Id. "It is well settled . . . that administrative officials do not possess the power to contravene a statute." Petition of Strandell, 132 N.H. 110, 119 (1989) (quotation omitted). "Administrative rules may not add to, detract from, or modify the statute which they are intended to implement." Id. Here, we do not defer to the defendant's statutory interpretation because it contravenes the plain meaning of the statutory scheme.

Relying upon the use of the future tense in some of the statutory provisions pertaining to what occurs before a person arrives at a designated receiving facility and the use of the past tense in some of the statutory provisions pertaining to what occurs after a person arrives at such a facility, the defendant argues that an involuntary emergency admission does not occur until a person arrives at a receiving facility. Compare RSA 135-C:28, I (stating that an approved medical service provider must find that "the person to be admitted" satisfies certain criteria and that "admission shall be made to the facility" (emphases added)), :29, I (requiring, upon completion of the involuntary emergency admission certificate, that law enforcement "take

12

custody of the person <u>to be</u> admitted" (emphasis added)), <u>with</u> RSA 135-C:31, I (stating that a probable cause hearing must occur "<u>after</u> an involuntary emergency admission" to determine whether "there <u>was</u> probable cause for involuntary emergency admission" (emphases added)).

However, statutory provisions that, even under the defendant's construction, govern post-admission events use phrases like "the person sought to be admitted" and "shall be." <u>See</u> RSA 135-C:30, I (providing that, "[a]t the receiving facility, any person sought to be . . . admitted for involuntary emergency admission shall be given immediate notice . . . and written notice within 12 hours" of certain rights), :31, IV ("For 48 hours prior to the hearing the person sought to be admitted shall not be given medication or treatment that would adversely affect his judgment or limit his ability to prepare for the hearing . . . ."). In context, therefore, we conclude that phrases like "the person sought to be admitted" merely identify the person who is the subject of the involuntary emergency admission, and that the phrase "shall be" merely indicates a mandate. <u>See</u> <u>In the Matter of Bazemore & Jack</u>, 153 N.H. 351, 354 (2006) ("It is a general rule of statutory construction that . . . the word 'shall' makes enforcement of a provision mandatory."); <u>American Express Travel v. Moskoff</u>, 144 N.H. 190, 191 (1999) (concluding that rule providing that a conditional default "shall be vacated" denotes a mandatory duty (quotation omitted)).

The defendant argues that our construction "functionally reads" RSA 135-C:30 and RSA 135-C:55 "out of [the] statute." RSA 135-C:30 requires that an involuntarily admitted person be advised of certain rights "[a]t the receiving facility." RSA 135-C:55 provides, in pertinent part, that certain statutory rights "shall only apply to . . . persons who have been admitted to receiving facilities." However, our statutory interpretation recognizes that certification and, thus, admission to the state mental health services system, and delivery to a receiving facility are intended to occur together. Accordingly, we disagree with the defendant that our statutory interpretation renders RSA 135-C:30 and RSA 135-C:55 superfluous.

Relying upon a case from another jurisdiction construing a different statutory scheme, <u>see</u> <u>Massachusetts General Hosp. v. C.R.</u>, 142 N.E.3d 545 (Mass. 2020), the defendant argues that "RSA 135-C:27-:33 contemplate that the act of filling out an [involuntary emergency admission] petition and certificate is separate and distinct from an [involuntary emergency admission] to a receiving facility." The defendant argues that, because the two acts are "separate and distinct," it is only when the individual arrives at and is admitted to a receiving facility that he or she is entitled to a probable cause hearing, among other rights. Because the Massachusetts statutory scheme in <u>C.R.</u> differs markedly from RSA 135-C:27-:33, the defendant's reliance upon <u>C.R.</u> is misplaced.

Under the Massachusetts scheme, a qualified mental health professional (or a police officer when one is not available) may restrain a person and apply for the person's hospitalization for a three-day period in a facility authorized for that purpose when the qualified mental health professional or police officer believes that the failure to hospitalize the person would create a likelihood of serious harm by reason of mental illness. <u>C.R.</u>, 142 N.E.3d at 550. Once transported to the approved facility, if the application for the person's hospitalization was made by someone other than an authorized physician, the person must be given a psychiatric examination immediately upon the person's reception at the facility, and is admitted to the facility only if the examiner determines that the failure to hospitalize the person would create the likelihood of serious harm by reason of mental illness. <u>Id</u>. at 551. After the three-day period elapses, the person must be discharged unless the person remains on a voluntary basis or the facility's superintendent applies to have the person committed. <u>Id</u>. Thus, the Massachusetts scheme provides for two evaluations of the person: a preliminary evaluation conducted before a mental health professional or police officer applies to have the person admitted to an approved facility and another evaluation conducted after the person has been transported to the facility. <u>See</u> <u>id</u>. at 550-51.

The issue in <u>C.R.</u> was whether the three-day window for the evaluation at the facility begins when the person is initially restrained. <u>See</u> <u>id</u>. at 547. The Massachusetts Supreme Judicial Court concluded that the initial restraint and preliminary evaluation of the person "is separate from the three-day involuntary hospitalization period," <u>id</u>., and, therefore, the three-day period does not begin when the person is initially restrained and preliminarily evaluated, <u>see</u> <u>id</u>. at 547, 553.

According to the court, "the Legislature envisioned an expedited, emergency process that took no longer than was necessary to transport the patient to an [emergency department], conduct a preliminary evaluation necessary to determine whether further evaluation and hospitalization . . . was necessary, and apply to such a facility for admission." <u>Id</u>. at 553. However, the Massachusetts statute "contains no specific time period" for the preliminary evaluation, <u>id</u>. at 547, and because of the difficulty in finding beds for "patients with high behavioral acuity or significant comorbidities," the time needed to apply to a facility for admission has been "unexpectedly extended" beyond the short period that the legislature envisioned. <u>Id</u>. at 554. Based upon the record before it, the court found "no realistic alternative" to boarding individuals in need of involuntary inpatient psychiatric care in hospital emergency rooms. <u>Id</u>.

However, the court declined to "impose a specific time deadline" into the statute governing the preliminary evaluation because the statute did not

include a deadline and the executive and legislative branches were aware of, and were working to resolve, the problem. Id. at 557. Nonetheless, the court "strongly encourage[d] the Legislature to identify a time period capping the time of [emergency department] boarding to clarify the over-all . . . time deadline and avoid future constitutional difficulties and to do so as expeditiously as possible." Id. at 559-60.

The Massachusetts statutory scheme, as described in C.R., differs from RSA 135:27-:33 in at least two important respects. The Massachusetts statutes provide for a person to be re-examined upon arrival at an authorized facility; RSA 135-C:27-:33 contain no analogous provision. See Doe, 2020 WL 2079310, at *9. Moreover, while the Massachusetts statute regarding the preliminary evaluation contains no time limit, RSA 135-C:29, I, mandates the person's "immediate[]" delivery to a receiving facility "[u]pon completion of an involuntary emergency admission certificate." In New Hampshire, although the acts of completing a certificate and delivering a person certified for involuntary emergency admission are separate, the plain meaning of RSA 135-C:29, I, requires the two acts to occur together.

The defendant contends that admission cannot take place upon completion of a certification because then "the terms 'involuntary emergency admission' and 'state mental health services system' are abstract concepts, such that a person may be 'admitted' to the 'state mental health services system' by private persons who do not work within that system without being physically present at a 'receiving facility' and therefore without receiving mental-health treatment." The defendant argues that interpreting the pertinent statutes to mean that admission is to the state mental health services system, rather than to a specific facility, "disregards the fact that the 'state mental health services system' is a system of treatment facilities that [DHHS] regulates and controls; it is not a system controlled by private actors who do not work within the system and who can force receiving facilities to intake patients they lack the capacity and resources to treat."

We reject a central premise of the defendant's argument. The state mental health services system does not solely consist of treatment facilities. It also consists of: (1) community mental health programs, which, at a minimum, provide "emergency, medical or psychiatric screening and evaluation, case management, and psychotherapy services," RSA 135-C:2, IV; (2) transitional housing program services, which provide "housing and support services to persons with serious and persistent mental illness," RSA 135-C:2, XV-a (Supp. 2020); (3) law enforcement officers, who, under certain circumstances, are statutorily required to take persons into custody, RSA 135-C:62 (2015); and (4) medical service providers "who are approved by either a designated receiving facility or a community mental health program approved by the commissioner" to complete certificates for involuntary emergency admission, RSA 135-C:28, I.

15

We disagree with the defendant that the medical service providers who are allowed by statute to complete certificates for involuntary emergency admission solely because they have been approved to do so are not part of the state mental health services system.  See Doe, 2020 WL 2079310, at *10 n.12.

Relatedly, the defendant argues that in permitting "private actors employed by private hospitals to impose upon the State a monetary obligation to fund the state mental health services system in order to provide full benefits to all persons for whom an [involuntary emergency admission certificate] has been signed," our statutory interpretation conflicts with the "well established" proposition "that the executive branch may expend public funds only to the extent, and for such purposes, as those funds may have been appropriated by the legislature."  Petition of Strandell, 132 N.H. at 115.  The defendant asserts that RSA chapter 135-C "gives [DHHS] the flexibility to provide mental-health services to those who need it within the limits of the resources provided."  She contends that she "can only increase capacity within the system when the legislature provides her the resources [to do] so," and that "[s]he is thus not just permitted to restrict access to services within that system when there is insufficient capacity to provide those services; it is constitutionally required."  The defendant relies upon RSA 135-C:13 and Petition of Strandell to support these assertions.

The defendant's reliance on RSA 135-C:13 is misplaced.  RSA 135-C:13 provides that "[e]very severely mentally disabled person shall be eligible for admission to the state mental health services system, and no such person shall be denied services because of race, color or religion, sex, gender identity, or inability to pay."  In contrast to individuals who are not "severely mentally disabled" within the meaning of RSA chapter 135-C, who must apply for voluntary admission to the state mental health services system, "severely mentally disabled" persons are automatically eligible for such admission.  See RSA 135-C:2, XV (defining "severely mentally disabled"), :12 (describing the process for voluntarily applying for mental health services from the state mental health services system), :13 (providing that "severely mentally disabled person[s] shall be eligible for admission to the state mental health services system" (emphasis added)).

RSA 135-C:13 pertains only to the voluntary admissions of "severely mentally disabled" individuals, and does not pertain to involuntary emergency admissions.  Accordingly, although RSA 135-C:13 provides that "[a]dmission to the state mental health services system and access to treatment and other services within the system shall be contingent upon the availability of appropriations," the admission to which RSA 135-C:13 refers is the voluntary admission of "severely mentally disabled" individuals.  Thus, under RSA 135-C:13, the right of "severely mentally disabled" individuals to voluntary admission to the state mental health services system is expressly conditioned

16

upon the availability of resources.  See Petition of Strandell, 132 N.H. at 115-16.  There is no such condition contained in the provisions governing involuntary emergency admissions.  See RSA 135-C:27-:33.

The defendant argues that the "'inherent constitutional limitation[ ] on the authority of the executive branch to expend public funds' . . . exists regardless of whether it is also reflected in the statutory text."  (Quoting Petition of Strandell, 132 N.H. at 116.)  However, as the plaintiff aptly asserts, "[a] purported scarcity of resources . . . is not a legal justification for agency non-compliance with [a] legislative command."  See In re Gamble, 118 N.H. 771, 773, 776 (1978) (declining to "accept the State's argument that its inability to find guardians excuses it from performing the legislative mandate" to "obtain and nominate guardians" for patients at NHH and residents of the Laconia State School).  Moreover, when the legislature "creates a class of beneficiaries which is greater than that which can be served by the amount of resources available for that purpose," and the statutory scheme "is silent as to how to resolve the predicament, the administering agency," here DHHS, "may establish reasonable classifications and priorities to allocate the limited resources."  Petition of Strandell, 132 N.H. at 119.

Whether DHHS, in fact, has established such reasonable classifications and priorities is not before us.  The only question before us is whether the plaintiff's continued confinement in NHH was unlawful under RSA chapter 135-C.  Accordingly, we express no opinion as to the plaintiff's assertions that DHHS "has failed to enact regulations that establish reasonable classifications and priorities for administering benefits," does not maintain a "wait list organized and monitored to serve those most in need," and has failed to develop "guidelines for prioritizing which individuals detained in emergency rooms will be entitled to receive services."

Petition of Strandell is distinguishable.  Petition of Strandell did not involve a petition for a writ of habeas corpus.  Rather, the issue in that case was whether an agency had established "reasonable classifications and priorities to allocate the limited resources" by adopting an administrative rule, which "establish[ed] a priority waiting list for developmentally disabled persons who apply for, and are entitled to receive, certain habilitative services" under a certain statute.  Petition of Strandell, 132 N.H. at 111, 119.  We upheld the challenged rule as a "necessary and reasonable means of implementing the statutory mandate . . . to the fullest extent possible in an environment of limited resources."  Id. at 122.

In urging us to adopt her statutory construction, the defendant makes several public policy arguments.  For instance, she argues that our statutory

17

interpretation "will either result in the circuit court holding probable cause hearings in private hospital [emergency departments], after which many patients will remain detained without treatment, or in courts ordering patients released from private hospital [emergency departments] when such hearings do not occur." She contends that our interpretation "is likely to increase the risk that mentally ill persons will harm themselves or others" because, if probable cause hearings cannot be provided, they "may be released . . . without treatment." The defendant also asserts that our interpretation "effectively forces statewide centralization of emergency mental health treatment, which will result in patients being transported outside of their communities to receive necessary care." Ultimately, she argues that our construction "will exacerbate the problems currently facing the mental-health system, likely render the system nonfunctional, and harm the individuals RSA chapter 135-C is designed to help."

The defendant's public policy arguments are made in the wrong forum. See Petition of Kilton, 156 N.H. 632, 645 (2007). "Matters of public policy are reserved for the legislature, and we therefore leave to it the task of addressing the [defendant's] concerns." Id. "Because our function is not to make laws, but to interpret them, any public policy arguments relevant to the wisdom of the statutory scheme and its consequences should be addressed to the General Court." Appeal of New England Police Benevolent Ass'n, 171 N.H. 490, 497 (2018) (quotations omitted).

III. Conclusion

The parties have made clear that the statutory process is not working as the legislature intended because of the lack of beds in receiving facilities. As a result, individuals who have been certified for involuntary emergency admission "are boarded in private hospitals while waiting for space in designated receiving facilities," and "[w]hile they wait, those persons are not provided treatment or probable cause hearings." Doe, 2020 WL 2079310, at *11. Nonetheless, we agree with the federal district court that the defendant "has a duty mandated by statute to provide for probable cause hearings within three days of when an [involuntary emergency admission] certificate is completed." Id. We do not opine as to how the defendant should comply with its statutorily-mandated duty as our system of government entrusts such decisions to our coordinate branches. Of course, if the legislature disagrees with our interpretation, it is free to amend the statutory scheme as it sees fit within constitutional bounds. See Appeal of New England Police Benevolent Ass'n, 171 N.H. at 497.

Affirmed.

BASSETT and DONOVAN, JJ., concurred.

18